**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FIFTH THIRD BANK, NATIONAL ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) | |
| EDWARD H. RUFF, CARYN RUFF PIERRE, BARRY HAUSAUER and NASSAU LIFE AND ANNUITY COMPANY, | ) ) ) ) | |
| Defendants, | | |

**COMPLAINT**

Plaintiff Fifth Third Bank, National Association ("Fifth Third"), by its counsel, Fox Rothschild LLP, and for its Complaint against Defendants Edward H. Ruff, Caryn Ruff Pierre, Barry Hausauer and Nassau Life and Annuity Company (collectively, the "Defendants"), states as follows:

**INTRODUCTION**

1.    Fifth Third, as successor in interest to MB Financial Bank, N.A. ("MB Bank"), seeks to recover (a) fraudulent transfers made to or for the benefit of the insiders of a failed borrower based on actual and constructive fraud; and (b) additional damages caused by the failed borrower's insider's financial misrepresentations made to MB Bank.

2.    As the borrower was insolvent and otherwise failing, its insiders fraudulently helped themselves to millions of dollars from a certain line of credit loan (the "Line of Credit Loan"), which was provided to the borrower by MB Bank. The insiders then "tossed the keys" of the failed

borrower to Fifth Third on their way out the door , as they attempted to abscond with millions in wrongfully transferred or otherwise obtained funds.

3.      Fifth Third also seeks to recover damages as a result of the Defendants presenting false financial statements and other financial information to MB Bank. The Defendants' financial misrepresentations enabled them to hide multiple events of default under their loan agreement with MB Bank and fraudulently withdraw millions of dollars from the Line of Credit Loan.

4.      Following a demand by Fifth Third, the Defendants refused to return the fraudulent transfers, contending, in part, that such amounts were the repayment of loans made by the insider Defendants to the borrower. However, such loans were not properly disclosed on the borrower's financial statements, in order to hide multiple events of default, which would have given MB Bank the right to limit the borrower's ability to withdraw or borrow amounts from the Line of Credit Loan, or even to outright terminate it. Moreover, these alleged loans were neither documented nor properly registered on the books and records of the borrower.

5.      To the extent the proceeds of such alleged insider loans were contributed to the borrower, they lack the typical characteristics of a loan, and should be more properly recharacterized as equity contributions to an inadequately capitalized borrower.

## THE PARTIES

6.      Fifth Third is a national banking association with its principal place of business located in Ohio.

7.      Edward H. Ruff, an individual, is a citizen of the State of Florida.

8.      Caryn Ruff Pierre, an individual, is a citizen of the State of Illinois.

9.      Barry Hausauer, an individual, is a citizen of the State of Florida.

10.     Nassau Life and Annuity Company ("Nassau") is a Connecticut corporation with its principal place of business located in the State of Connecticut.

## JURISDICTION AND VENUE

11.     This Court has personal jurisdiction over the parties to this dispute.

12.     This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §1332(a)(1) because there is diversity between the citizenship of the Plaintiff and the citizenships of the Defendants and because the amount in controversy is greater than $75,000.

13.     This Court is an appropriate venue within which to adjudicate this dispute pursuant to 28 U.S.C. §1391(b)(2) because the events giving rise to the claims occurred in this District.

## THE LOAN TO SANTA'S BEST

14.     On May 29, 2015, MB Bank, the lender, and Santa's Best, the borrower, entered into the Amended and Restated Loan and Security Agreement (as amended from time to time, the "Loan Agreement"). Pursuant to the Loan Agreement, MB Bank agreed to provide the Line of Credit Loan to Santa's Best, which  was secured by substantially all of Santa's Best's assets. A true and correct copy of the Loan Agreement is attached to this Complaint as Exhibit A.

15.     MB Bank was a national banking association that was acquired by Fifth Third via merger in May of 2019.

16.     Prior to its insolvency, Santa's Best was an Illinois general partnership. At all relevant times, the general partners of Santa's Best were Tinsel/Ruff Group Limited Partnership, an Illinois limited liability company ("Tinsel/Ruff"), and A-Chicago Tech, L.L.C., a Delaware limited liability company ("A-Chicago").

17.     At all relevant times, Edward H. Ruff and Associates, Inc., an Illinois corporation, was the general partner of Tinsel/Ruff.

18.     At all relevant times, Edward H. Ruff was the President of Edward H. Ruff and Associates.

19.     At all relevant times, Edward H. Ruff was the Manager of A-Chicago.

20. At all relevant times, substantially all of Santa's Best's equity was owned (both directly and indirectly) and controlled by Edward H. Ruff and his immediate family.

21. At all relevant times, Edward H. Ruff was the Chief Executive Officer of Santa's Best.

22. At all relevant times, Barry Hausauer was the Chief Operating Officer and Chief Financial Officer of Santa's Best.

23. Caryn Ruff Pierre is the daughter of Santa's Best CEO, Edward H. Ruff.

24. In May of 2019, Santa's Best went out of business and its assets liquidated. Currently, the balance owed by Santa's Best to Fifth Third pursuant to the Line of Credit Loan is in excess of $15,500.000.00.

## THE FRAUDULENT TRANSFERS

25. Shortly before going out of business, Santa's Best fraudulently transferred money to or for the benefit of its CEO, Edward H. Ruff, in the total amount of $4,309,504.21. Such transfers are more particularly described in Exhibit B (collectively, the "Edward Fraudulent Transfers") attached to this Complaint.

26. Shortly before going out of business, Santa's Best fraudulently transferred money to or for the benefit of its CEO Edward H. Ruff's daughter, Caryn Ruff Pierre, in the total amount of $725,757.00. Such transfers are more particularly described in Exhibit C (collectively, the "Caryn Fraudulent Transfers") attached to this Complaint.

27. Shortly before going out of business, Santa's Best fraudulently transferred money (collectively, the "Nassau Fraudulent Transfers") to Nassau for the benefit of Edward H. Ruff and/or his immediate family members who hold an insurance policy or investment vehicle with Nassau, in (a) the amount of $603,866.66 on December 18, 2018; and (b) the amount of $2,937,313.41 on March 12, 2019.

4

**THE FALSE REPRESENTATIONS**

28.     Under the terms of the Loan Agreement, Santa's Best was required to comply with certain financial and other covenants. If Santa's Best failed to satisfy a covenant, it would constitute an "Event of Default," as defined under the Loan Agreement. The covenants included, among other obligations, that Santa's Best would: (a) pursuant to Section 10.1 of the Loan Agreement, maintain a Tangible Net Worth (as defined in the Loan Agreement) in excess of $4,000,000 (the "Tangible Net Worth Covenant") as of the end of each fiscal year; (b) pursuant to Section 10.2 of the Loan Agreement, maintain a certain ratio of outstanding amounts due under the Revolving Line Loan to a measure of earnings (the "Senior Debt to EBITDA Covenant") as of the end of each fiscal quarter; and (c) pursuant to Section 8.8 of the Loan Agreement, periodically provide certain financial statements and other financial information to MB Bank.

29.     The Loan Agreement provided that, if Santa's Best failed to satisfy either the Tangible Net Worth Covenant or the Senior Debt to EBITDA Covenant, it would be considered an Event of Default. The Loan Agreement also provided that, if Santa's Best otherwise made any material misrepresentation to MB Bank, it would also be considered an Event of Default.

30.     The Loan Agreement further stipulated that, as a condition to Santa's Best borrowing or drawing any amounts under the Line of Credit Loan, there could be no Event of Default. Moreover, MB Bank was entitled to terminate the Line of Credit Loan upon any Event of Default.

**The Undisclosed Insider Loans**

31.     In response to a demand for the repayment of a portion of the Edward Fraudulent Transfers and the Nassau Fraudulent Transfers, Edward H. Ruff alleged that approximately $4,300,000 of such transfers were loan (the "Insider Loans") repayments made to Santa's Best.

32.     However, the financial statements and other information provided to MB Bank by Edward H. Ruff and Barry Hausauer materially understated the amounts owed as Insider Loans. These misrepresentations also materially understated the total debt owed by Santa's Best on its financial statements and other information provided to MB Bank.

### The Undisclosed LedUp Claims

33.     Prior to its insolvency, Santa's Best was in the business of selling Christmas lights and other holiday decorations (collectively, the "Products") to large retailers.

34.     Beginning in 2012, Santa's Best purchased a significant majority of its Products from a manufacturer in China, Guangde LedUp Enterprises Inc. ("LedUp"), through an affiliate of LedUP, 1 Energy Solutions, Inc. ("1 Energy").

35.     Throughout its business dealings with LedUp and 1 Energy, Santa's Best would draw from the Line of Credit Loan in order to make large prepayments to (or deposits with) 1 Energy for the production of its Products. The parties would then document the advances with promissory notes (the "1 Energy Notes") from 1 Energy to Santa's Best.

36.     The 1 Energy Notes would be offset against the purchase price of the Products bought by Santa's Best.

37.     The principal balance of the 1 Energy Notes was shown as an asset of Santa's Best on its periodic financial statements, as provided to MB Bank.

38.     However, early in the business relationship between Santa's Best and LedUp and 1 Energy, disputes arose as to the amounts due from Santa's Best to LedUp and 1 Energy (collectively, the "LedUp Claims"). The LedUp Claims arose largely from Santa's Best charging LedUp for various disputed claims and unilaterally taking an offset from amounts due from Santa's Best for Products it had purchased. These disputes dated as far back as at least 2014.

6

39.     The amounts claimed by LedUp were addressed by LedUp and 1 Energy multiple times with Santa's Best, largely via meetings and communications with Defendants Edward H. Ruff and Barry Hausauer.

40.     As of the beginning of 2018, the total amount of the LedUp Claims against Santa's Best had grown in excess of $5,000,000.

41.     Santa's Best failed to account for the LedUp Claims on its financial statements that it provided to MB Bank, either as an offset to the 1 Energy Notes, as a payable to LedUp, or otherwise. Such misrepresentations made the financial statements presented to MB Bank materially misleading.

42.     The failure to fully disclose the Insider Loans and the LedUp Claims resulted in Santa's Best (a) materially overstating its earnings to MB Bank; (b) materially overstating its assets to MB Bank; (c) materially understating its liabilities to MB Bank; and (d) hiding breaches of the Tangible Net Worth Covenant and Senior Debt to EBITDA Covenant from MB Bank.

43.     These material misrepresentations helped Santa's Best hide multiple Events of Default under the Loan Agreement, enabling it to wrongfully draw and use millions of dollars from the Line of Credit Loan, including by making the Edward Fraudulent Transfers, the Caryn Fraudulent Transfers, and the Nassau Fraudulent Transfers.

## COUNT I
### Fraudulent Transfer Claim Under 740 Ill. Comp. Stat. 160/5(a)(1): Actual Fraud

44.     Fifth Third incorporates the allegations of paragraphs 1 - 43 above as if fully set forth herein.

45.     This is a claim based on a fraudulent transfer under 740 Ill. Comp. Stat. 160/5(a)(1).

46.     Fifth Third is entitled to relief, including but not limited to avoidance of the Edward Fraudulent Transfers, the Caryn Fraudulent Transfers, and the Nassau Fraudulent Transfers, under 740 Ill. Comp. Stat. 160/8(a).

47.     Section 5(a)(1) provides that:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor[.]

48.     The Illinois Fraudulent Transfer Act ("UFTA") defines a claim to include "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 740 ILCS 160/2(c).

49.     MB Bank had a claim against Santa's Best, and was therefore a creditor as defined under the UFTA, during all relevant times.

50.     In determining whether a debtor made a transfer or incurred an obligation with actual intent to defraud under section 5(a)(1), Illinois law provides that consideration may be given to outside factors, including but not limited to the following presented in this case:

    i.  The transfers were to or for the benefit of insiders;

    ii. Santa's Best used the proceeds of the Line of Credit Loan from MB Bank to make the fraudulent transfers while Santa's Best was in default under the Loan Agreement and thus not entitled to use the Line of Credit Loan;

    iii. Santa's Best fraudulently induced MB Bank to keep the Line of Credit Loan open in order to make the fraudulent transfers;

    iv. Santa's Best was uncertain about its financial future at the time it made the fraudulent transfers;

    v.   Santa's Best was undercapitalized at the time of the fraudulent transfers;

    vi.   Santa's Best had a material dispute with its major supplier at the time of the fraudulent transfers;

    vii.   Santa's Best provided materially false financial information to MB Bank in order to continue to use the Line of Credit Loan to make the fraudulent transfers;

    viii.   Santa's Best concealed its precarious financial situation in order to make the fraudulent transfers;

    ix.   The value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred;

    x.   Santa's Best was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

    xi.   Santa's Best shut down its operations shortly after it made the fraudulent transfers; and

    xii.   The fraudulent transfers created a substantial debt under the Line of Credit Loan.

51.    The fraudulent transfers were made from loan proceeds that Santa's Best was not entitled to use.

52.    Santa's Best acted with fraudulent intent to transfer proceeds from the Line of Credit Loan to the Defendants.

53.    The transfers were made with actual intent to hinder, delay, or defraud MB Bank, as evidenced by the facts set forth above.

WHEREFORE, Fifth Third respectfully requests that the Court enter an Order in favor of Fifth Third:

a)   avoiding the Edward Fraudulent Transfers;

b)   avoiding the Caryn Fraudulent Transfers;

c)   avoiding the Nassau Fraudulent Transfers;

d)   entering judgment in favor of Fifth Third and against Edward H. Ruff in the amount of the Edward Fraudulent Transfers;

e)   entering judgment in favor of Fifth Third and against Caryn Pierre Ruff in the amount of the Caryn Fraudulent Transfers;

f)   entering judgment in favor of Fifth Third and against Edward H. Ruff in the amount of the Nassau Fraudulent Transfers; and

g)   awarding Fifth Third such other and further relief as this Court deems just and proper.

## COUNT II
**Fraudulent Transfer Claim Under 740 Ill. Comp. Stat. 160/5(a)(2): Constructive Fraud**

54.   Fifth Third incorporates the allegations of paragraphs 1 - 53 above as if fully set forth herein.

55.   This is a claim based on a fraudulent transfer under 740 Ill. Comp. Stat. 160/5(a)(2).

56.   Fifth Third is entitled to relief, including but not limited to avoidance of the Edward Fraudulent Transfers, the Caryn Fraudulent Transfers, and the Nassau Fraudulent Transfers, under 740 Ill. Comp. Stat. 160/8(a).

57.   Section 5(a)(2) provides that:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

… (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

58.     Each of the fraudulent transfers complained of herein impaired the rights of Santa's Best's creditors.

59.     The Edward Fraudulent Transfers, the Caryn Fraudulent Transfers, and the Nassau Fraudulent Transfers were each made after Santa's Best was insolvent.

60.     Santa's Best did not receive reasonably equivalent value in exchange for the Edward Fraudulent Transfers, the Caryn Fraudulent Transfers, and the Nassau Fraudulent Transfers.

61.     At the time of each of the Edward Fraudulent Transfers, the Caryn Fraudulent Transfers, and the Nassau Fraudulent Transfers, Santa's Best was engaging in business for which its remaining assets were unreasonably small in relation to the business.

62.     The Edward Fraudulent Transfers, the Caryn Fraudulent Transfers, and the Nassau Fraudulent Transfers were each made at a time when Santa's Best had significant indebtedness to MB Bank and other creditors.

63.     At the time of the Edward Fraudulent Transfers, the Caryn Fraudulent Transfers, and the Nassau Fraudulent Transfers, Santa's Best had incurred, and was continuing to incur, debts beyond its ability to pay as they became due.

WHEREFORE, Fifth Third respectfully requests that the Court enter an Order in favor of Fifth Third:

a)      avoiding the Edward Fraudulent Transfers;

b)      avoiding the Caryn Fraudulent Transfers;

c)      avoiding the Nassau Fraudulent Transfers;

d)      entering judgment in favor of Fifth Third and against Edward H. Ruff in the amount of the Edward Fraudulent Transfers;

e)      entering judgment in favor of Fifth Third and against Caryn Pierre Ruff in the amount of the Caryn Fraudulent Transfers;

f)      entering judgment in favor of Fifth Third and against Edward H. Ruff in the amount of the Nassau Fraudulent Transfers; and

g)      awarding Fifth Third such other and further relief as this Court deems just and proper.

## COUNT III
### Fraudulent Transfer Claim Under 740 Ill. Comp. Stat. 160/6(a): Constructive Fraud

64.      Fifth Third incorporates the allegations of paragraphs 1 - 63 above as if fully set forth herein.

65.      This is a claim based on a fraudulent transfer under 740 Ill. Comp. Stat. 160/6(a).

66.      Fifth Third is entitled to relief, including but not limited to, avoidance of the Edward Fraudulent Transfers, the Caryn Fraudulent Transfers, and the Nassau Fraudulent Transfers, under 740 Ill. Comp. Stat. 160/8(a).

67.      Section 6(a) provides that:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

68.      MB Bank's claim against Santa's Best arose prior to the time Santa's Best made each of the Edward Fraudulent Transfers, the Caryn Fraudulent Transfers, and the Nassau Fraudulent Transfers.

69.     Santa's Best did not receive reasonably equivalent value in exchange for any of the Edward Fraudulent Transfers, the Caryn Fraudulent Transfers, or the Nassau Fraudulent Transfers.

70.     At the time of each of the Edward Fraudulent Transfers, the Caryn Fraudulent Transfers, and the Nassau Fraudulent Transfers, Santa's Best was insolvent or became insolvent as a result of such transfer.

WHEREFORE, Fifth Third respectfully requests that the Court enter an Order in favor of Fifth Third:

a)      avoiding the Edward Fraudulent Transfers;

b)      avoiding the Caryn Fraudulent Transfers;

c)      avoiding the Nassau Fraudulent Transfers;

d)      entering judgment in favor of Fifth Third and against Edward H. Ruff in the amount of the Edward Fraudulent Transfers;

e)      entering judgment in favor of Fifth Third and against Caryn Pierre Ruff in the amount of the Caryn Fraudulent Transfers;

f)      entering judgment in favor of Fifth Third and against Edward H. Ruff in the amount of the Nassau Fraudulent Transfers; and

g)      awarding Fifth Third such other and further relief as this Court deems just and proper.

**COUNT IV**
**False Representations**
**(Ruff and Hausauer)**

71.     Fifth Third incorporates the allegations of paragraphs 1 - 70 above as if fully set forth herein.

72.     The false representations set forth above (the "False Representations") were made by Edward H. Ruff and Barry Hausauer either fraudulently or negligently.

73.     The False Representations were false statements of material fact.

74.     Edward H. Ruff and Barry Hausauer made these False Representations (a) knowing they were false, or (b) recklessly or (c) negligently by failing to ascertain the truth of such representations.

75.     Edward H. Ruff and Barry Hausauer made the False Representations with the intention of misleading MB Bank, so that MB Bank would not limit their ability to draw or borrow from the Line of Credit Loan, or even terminate it.

76.     MB Bank justifiably relied on the purported truth of the financial statements and other information provided to it by Defendants

77.     MB Bank was damaged as a result of such reliance.

78.     Edward H. Ruff and Barry Hausauer owed MB Bank a duty to communicate accurate information to MB Bank regarding Santa's Best's financial statements and other financial information.

        WHEREFORE, Fifth Third respectfully requests that the Court enter an Order in favor of Fifth Third:

   a)     entering judgment in favor of Fifth Third and against Edward H. Ruff in the amount not less than $15,500,000;

   b)     entering judgment in favor of Fifth Third and against Barry Hausauer in the amount not less than $15,500,000; and

   c)     awarding Fifth Third such other and further relief as this Court deems just and proper.

## COUNT V
### Recharacterization of Insider Loans

79.     Fifth Third incorporates the allegations of paragraphs 1 - 78 above as if fully set forth herein.

80.     The Insider Loans must be recharacterized as equity contributions.

81.     The Insider Loans were never evidenced by any promissory notes or other formal loan documentation whatsoever.

82.     The Insider Loans lacked formal loan terms, including any maturity dates.

83.     The Insider Loans were made to Sana's Best at a time when Santa's Best was inadequately capitalized.

84.     The Insider Loans were not properly accounted for as loans or debt on the books and records of Santa's Best.

85.     The Insider Loans were not properly accounted for on the financial statements and other information provided to MB Bank.

WHEREFORE, Fifth Third respectfully requests that the Court enter an Order in favor of Fifth Third:

a)   Declaring that the Insiders Loan were in fact equity contributions and not debt; and

b)   awarding Fifth Third such other and further relief as this Court deems just and proper.

Dated: April 14, 2022

Respectfully submitted,

FIFTH THIRD BANK, NATIONAL ASSOCIATION,

By:  _/s/ Robert W. Glantz_
One of Its Attorneys

Robert W. Glantz (#6201207)
Laura Caplin (#6297784)
Gabrielle Winslow (#6330644)
FOX ROTHSCHILD LLP
321 North Clark Street, Suite 1600
Chicago, Illinois 60654
(312) 517-9200

<u>Exhibit A</u>

The Loan Agreement

#1

/

## AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT

This AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT dated as of May 29, 2015 (the "Agreement"), is executed by and between SANTA'S BEST, an Illinois general partnership (the "Borrower"), which has its chief executive office located at 3750 Deerfield Road, Suite 1000, Riverwoods, Illinois 60015, and MB FINANCIAL BANK, N.A. successor in interest to Cole Taylor Bank ("Bank"), whose address is 6111 N. River Road, Rosemont, Illinois 60018.

### R E C I T A L S:

A.     Prior hereto, Bank provided certain extensions of credit, loans and other financial accommodations to Borrower pursuant to (i) that certain Loan and Security Agreement dated as of July 1, 2008, by and between Bank and Borrower, as amended from time to time prior hereto (the "Prior Loan Agreement"), and (ii) the other agreements, documents and instruments executed and delivered in connection therewith.

B.     The Borrower desires Bank to amend and restate the Prior Loan Agreement as set forth in this Loan Agreement and provide the financial accommodations set forth herein (the "Financial Accommodations").

C.     Bank is willing to provide the Financial Accommodations to Borrower, but solely on the terms and subject to the conditions set forth in this Agreement, which is an amendment and restatement of the Prior Loan Agreement and the other documents, instruments and agreements executed and delivered pursuant to this Agreement or referenced herein.

NOW THEREFORE, in consideration of the Financial Accommodations, the mutual promises and understandings of Bank and Borrower set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Borrower agrees to borrow from the Bank, and the Bank agrees to lend to the Borrower, subject to and upon the following terms and conditions:

### A G R E E M E N T S:

Section 1.     DEFINITIONS.

1.1.     Defined Terms.  For the purposes of this Agreement, the following capitalized words and phrases shall have the meanings set forth below.

"Affiliate" of any Person shall mean (a) any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person, (b) any officer or director of such Person, and (c) with respect to the Bank, any entity administered or managed by the Bank, or an Affiliate or investment advisor thereof and which is engaged in making, purchasing, holding or otherwise investing in commercial loans.  A Person shall be deemed to be "controlled by" any other Person if such Person possesses, directly or indirectly, power to direct or cause the direction of the management and policies of such Person whether by contract, ownership of voting securities, membership interests or otherwise.  Tinsel/Ruff Group

Limited Partnership, an Illinois limited partnership ("Tinsel"), shall be deemed an Affiliate of Borrower.

"Asset Disposition" shall mean the sale, lease, assignment or other transfer for value (each a "Disposition") by the Borrower or any Subsidiary to any Person (other than the Borrower or any Subsidiary) of any asset or right of the Borrower or any Subsidiary (including, the loss, destruction or damage of any thereof or any actual or threatened (in writing to the Borrower or such Subsidiary) condemnation, confiscation, requisition, seizure or taking thereof), other than (a) the Disposition of any asset which is to be replaced, and is in fact replaced, within thirty (30) days with another asset performing the same or a similar function, and (b) the sale or lease of inventory in the ordinary course of business.

"Bank Product Agreements" shall mean those certain agreements entered into from time to time by the Borrower or any Subsidiary with the Bank or any Affiliate of the Bank concerning Bank Products.

"Bank Product Obligations" shall mean all obligations, liabilities, contingent reimbursement obligations, fees, and expenses owing by the Borrower or any Subsidiary to the Bank or any Affiliate of the Bank pursuant to or evidenced by the Bank Product Agreements and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising.

"Bank Products" shall mean any service or facility extended to the Borrower or any Subsidiary by the Bank or any Affiliate of the Bank, including: (a) credit cards, (b) credit card processing services, (c) debit cards, (d) purchase cards, (e) ACH transactions, (f) cash management, including controlled disbursement, accounts or services, or (g) Hedging Agreements.

"Bankruptcy Code" shall mean the United States Bankruptcy Code, as now existing or hereafter amended.

"Business Day" shall mean any day other than a Saturday, Sunday or a legal holiday on which banks are authorized or required to be closed for the conduct of commercial banking business in Chicago, Illinois.

"Capital Expenditures" shall mean all expenditures (including Capitalized Lease Obligations) which, in accordance with GAAP, would be required to be capitalized and shown on the consolidated balance sheet of the Borrower, but excluding expenditures made in connection with the replacement, substitution or restoration of assets to the extent financed (i) from insurance proceeds (or other similar recoveries) paid on account of the loss of or damage to the assets being replaced or restored or (ii) with awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced.

"Capital Lease" shall mean, as to any Person, a lease of any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, by such Person, as lessee, that is, or should be, in accordance with Financial Accounting Standards Board Statement No. 13, as amended from time to time, or, if such statement is not then in effect, such statement

2

of GAAP as may be applicable, recorded as a "capital lease" on the financial statements of such Person prepared in accordance with GAAP.

"Capital Securities" shall mean, with respect to any Person, all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital, whether now outstanding or issued or acquired after the date hereof, including common shares, preferred shares, membership interests in a limited liability company, limited or general partnership interests in a partnership or any other equivalent of such ownership interest.

"Capitalized Lease Obligations" shall mean, as to any Person, all rental obligations of such Person, as lessee under a Capital Lease which are or will be required to be capitalized on the books of such Person.

"Cash Equivalent Investment" shall mean, at any time, (a) any evidence of Debt, maturing not more than one year after such time, issued or guaranteed by the United States government or any agency thereof, (b) commercial paper, maturing not more than one year from the date of issue, or corporate demand notes, in each case (unless issued by the Bank or its holding company) rated at least A-1 by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. or P-1 by Moody's Investors Service, Inc., (c) any certificate of deposit, time deposit or banker's acceptance, maturing not more than one year after such time, or any overnight Federal Funds transaction that is issued or sold by the Bank or its holding company (or by a commercial banking institution that is a member of the Federal Reserve System and has a combined capital and surplus and undivided profits of not less than $500,000,000), (d) any repurchase agreement entered into with the Bank, or other commercial banking institution of the nature referred to in clause (c), which (i) is secured by a fully perfected security interest in any obligation of the type described in any of clauses (a) through (c) above, and (ii) has a market value at the time such repurchase agreement is entered into of not less than 100% of the repurchase obligation of the Bank, or other commercial banking institution thereunder, (e) money market accounts or mutual funds which invest exclusively in assets satisfying the foregoing requirements, and (f) other short term liquid investments approved in writing by the Bank.

"Change in Control" shall mean the occurrence of any of the following events: (a) Edward H. Ruff, or a trust of which he is considered to be the owner for federal income tax purposes, shall cease to own and control, directly or indirectly, at least 80% of the outstanding Capital Securities of the Borrower; (b) the Borrower shall cease to, directly or indirectly, own and control 100% of each class of the outstanding Capital Securities of each Subsidiary; or (c) the granting by Edward H. Ruff, or a trust of which he is considered to be the owner for federal income tax purposes, directly or indirectly, of a security interest in his or its ownership interest in the Borrower, which could result in a change in the identity of the individuals or entities in control of the Borrower. For the purpose hereof, the terms "control" or "controlling" shall mean the possession of the power to direct, or cause the direction of, the management and policies of the Borrower by contract or voting of securities or ownership interests.

"Closing Date" shall mean the date of this Agreement.

"Collateral" shall have the meaning set forth in Section 6.1 hereof.

3

"Collateral Access Agreement" shall mean an agreement in form and substance reasonably satisfactory to the Bank pursuant to which a lessor of real property on which Collateral is stored or otherwise located, or a warehouseman, processor or other bailee of Inventory or other property owned by the Borrower or any Subsidiary, acknowledges the Liens of the Bank and waives any Liens held by such Person on such property, and, in the case of any such agreement with a lessor, permits the Bank reasonable access to and use of such real property following the occurrence and during the continuance of an Event of Default to assemble, complete and sell any collateral stored or otherwise located thereon.

"Commodity Exchange Act": shall mean the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" shall have the meaning set forth in Section 8.10 hereof.

"Contingent Liability" and "Contingent Liabilities" shall mean, respectively, each obligation and liability of the Borrower and all such obligations and liabilities of the Borrower incurred pursuant to any agreement, undertaking or arrangement by which the Borrower: (a) guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss) the indebtedness, dividend, obligation or other liability of any other Person in any manner (other than by endorsement of instruments in the course of collection), including any indebtedness, dividend or other obligation which may be issued or incurred at some future time; (b) guarantees the payment of dividends or other distributions upon the shares or ownership interest of any other Person; (c) undertakes or agrees (whether contingently or otherwise): (i) to purchase, repurchase, or otherwise acquire any indebtedness, obligation or liability of any other Person or any property or assets constituting security therefor, (ii) to advance or provide funds for the payment or discharge of any indebtedness, obligation or liability of any other Person (whether in the form of loans, advances, stock purchases, capital contributions or otherwise), or to maintain solvency, assets, level of income, working capital or other financial condition of any other Person, or (iii) to make payment to any other Person other than for value received; (d) agrees to lease property or to purchase securities, property or services from such other Person with the purpose or intent of assuring the owner of such indebtedness or obligation of the ability of such other Person to make payment of the indebtedness or obligation; (e) to induce the issuance of, or in connection with the issuance of, any letter of credit for the benefit of such other Person; or (f) undertakes or agrees otherwise to assure a creditor against loss. The amount of any Contingent Liability shall (subject to any limitation set forth herein) be deemed to be the outstanding principal amount (or maximum permitted principal amount, if larger) of the indebtedness, obligation or other liability guaranteed or supported thereby.

"Debt" shall mean, as to any Person, without duplication, (a) all indebtedness of such Person; (b) all borrowed money of such Person (including principal, interest, fees and charges), whether or not evidenced by bonds, debentures, notes or similar instruments; (c) all obligations to pay the deferred purchase price of property or services; (d) all obligations, contingent or otherwise, with respect to the maximum face amount of all letters of credit (whether or not drawn), bankers' acceptances and similar obligations issued for the account of such Person (including the Letters of Credit), and all unpaid drawings in respect of such letters of

credit, bankers' acceptances and similar obligations; (e) all indebtedness secured by any Lien on any property owned by such Person, whether or not such indebtedness has been assumed by such Person (provided, however, if such Person has not assumed or otherwise become liable in respect of such indebtedness, such indebtedness shall be deemed to be in an amount equal to the fair market value of the property subject to such Lien at the time of determination); (f) the aggregate amount of all Capitalized Lease Obligations of such Person; (g) all Contingent Liabilities of such Person, whether or not reflected on its balance sheet; (h) all Hedging Obligations of such Person; (i) all Debt of any partnership of which such Person is a general partner; and (j) all monetary obligations of such Person under (i) a so-called synthetic, off-balance sheet or tax retention lease, or (ii) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment). Notwithstanding the foregoing, Debt shall not include trade payables and accrued expenses incurred by such Person in accordance with customary practices and in the ordinary course of business of such Person.

"Default Rate" shall mean a per annum rate of interest equal to the Revolving Interest Rate plus three percent (3.0%).

"Depreciation" shall mean the total amounts added to depreciation, amortization, obsolescence, valuation and other proper reserves, as reflected on the Borrower's financial statements and determined in accordance with GAAP.

"EBITDA" shall mean, for any period, (a) the sum for such period of: (i) Net Income, plus (ii) Interest Charges, plus (iii) federal and state income taxes (including the Illinois replacement tax), plus (iv) Depreciation, plus (v) non-cash management compensation expenses, plus (vi) all other non-cash charges, excluding (b) income or loss attributable to equity in any Affiliate or Subsidiary, in each case to the extent included in determining Net Income for such period.

"Employee Plan" includes any pension, stock bonus, employee stock ownership plan, retirement, profit sharing, deferred compensation, stock option, bonus or other incentive plan, whether qualified or nonqualified, or any disability, medical, dental or other health plan, life insurance or other death benefit plan, vacation benefit plan, severance plan or other employee benefit plan or arrangement, including those pension, profit-sharing and retirement plans of the Borrower described from time to time in the financial statements of the Borrower and any pension plan, welfare plan, Defined Benefit Pension Plans (as defined in ERISA) or any multi-employer plan, maintained or administered by the Borrower or to which the Borrower is a party or may have any liability or by which the Borrower is bound.

"Environmental Laws" shall mean all present or future federal, state or local laws, statutes, common law duties, rules, regulations, ordinances and codes, together with all administrative or judicial orders, consent agreements, directed duties, requests, licenses, authorizations and permits of, and agreements with, any governmental authority, in each case relating to any matter arising out of or relating to public health and safety, or pollution or protection of the environment or workplace, including any of the foregoing relating to the presence, use, production, generation, handling, transport, treatment, storage, disposal,

distribution, discharge, emission, release, threatened release, control or cleanup of any Hazardous Substance.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Event of Default" shall mean any of the events or conditions which are set forth in Section 11 hereof.

"GAAP" shall mean generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination, provided, however, that interim financial statements or reports shall be deemed in compliance with GAAP despite the absence of footnotes and fiscal year-end adjustments as required by GAAP.

"Guaranty" shall mean that certain Continuing Unconditional Guaranty dated as of July 1, 2008, executed and delivered by Borrower to Bank, as amended or restated from time to time, guaranteeing the obligations of Tinsel to the Bank under that certain Loan and Security Agreement dated as of July 1, 2008, by and between Tinsel and Bank, as amended or restated from time to time (the "Tinsel Loan Agreement").

"Hazardous Substances" shall mean (a) any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, dielectric fluid containing levels of polychlorinated biphenyls, radon gas and mold; (b) any chemicals, materials, pollutant or substances defined as or included in the definition of "hazardous substances", "hazardous waste", "hazardous materials", "extremely hazardous substances", "restricted hazardous waste", "toxic substances", "toxic pollutants", "contaminants", "pollutants" or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, the exposure to, or release of which is prohibited, limited or regulated by any governmental authority or for which any duty or standard of care is imposed pursuant to, any Environmental Law.

"Hedging Agreement" shall mean any interest rate, currency or commodity swap agreement, cap agreement or collar agreement, and any other agreement or arrangement designed to protect a Person against fluctuations in interest rates, currency exchange rates or commodity prices.

"Hedging Obligation" shall mean, with respect to any Person, any liability of such Person under any Hedging Agreement.

"Indemnified Party" and "Indemnified Parties" shall mean, respectively, each of the Bank and any parent corporation, Affiliate or Subsidiary of the Bank, and each of their respective officers, directors, employees, attorneys and agents, and all of such parties and entities.

"Intellectual Property" shall mean the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, patents, service marks and trademarks, and all registrations and applications for registration therefor and all licensees thereof, trade names, domain names, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Interest Charges" shall mean, for any period, the sum of (a) all interest, charges and related expenses payable with respect to that fiscal period to a lender in connection with borrowed money or the deferred purchase price of assets that are treated as interest in accordance with GAAP, plus (b) the portion of Capitalized Lease Obligations with respect to that fiscal period that should be treated as interest in accordance with GAAP, plus (c) all charges paid or payable (without duplication) during that period with respect to any Hedging Agreements.

"Interest Period" shall mean successive one, two or three month periods, beginning and ending as provided in this Agreement.

"Investment" shall mean, with respect to any Person, any investment in another Person, whether by acquisition of any debt or equity security, by making any loan or advance, by becoming obligated with respect to a Contingent Liability in respect of obligations of such other Person (other than travel and similar advances to employees in the ordinary course of business).

"LC Agreement" shall mean, at any time, with respect to the issuance of Letters of Credit, a Continuing Agreement for Commercial and Standby Letters of Credit in the form being used by the Bank at such time and executed by Borrower and accepted by Bank, together with all amendments, modifications and restatements thereof.

"Letter of Credit" and "Letters of Credit" shall mean, respectively, a letter of credit and all such letters of credit issued by the Bank, in its reasonable discretion, upon the execution and delivery by the Borrower and the acceptance by the Bank of a LC Agreement and a Letter of Credit Application, as set forth in Section 2.5 of this Agreement.

"Letter of Credit Application" shall mean, with respect to any request for the issuance of a Letter of Credit, a letter of credit application in the form being used by the Bank at the time of such request for the type of Letter of Credit requested.

"Letter of Credit Commitment" shall mean, at any time, an amount equal to the Revolving Loan Commitment minus the aggregate amount of all Revolving Loans outstanding.

"Letter of Credit Fee Amount" shall have the meaning set forth in Section 5.3 hereof.

"Letter of Credit Maturity Date" shall mean the Revolving Loan Maturity Date.

"Letter of Credit Obligations" shall mean, at any time, an amount equal to the aggregate of the original face amounts of all Letters of Credit minus the sum of (i) the amount of any reductions in the original face amount of any Letter of Credit which did not result from a

draw thereunder, (ii) the amount of any payments made by the Bank with respect to any draws made under a Letter of Credit for which the Borrower has reimbursed the Bank or which have been repaid to the Bank as a direct advance under the Revolving Loan, and (iii) the portion of any issued but expired Letter of Credit which has not been drawn by the beneficiary thereunder. For purposes of determining the outstanding Letter of Credit Obligations at any time, the Bank's acceptance of a draft drawn on the Bank pursuant to a Letter of Credit shall constitute a draw on the applicable Letter of Credit at the time of such acceptance.

"Liabilities" shall mean at all times all liabilities of the Borrower that would be shown as such on a balance sheet of the Borrower prepared in accordance with GAAP.

"LIBOR" means a rate of interest equal to the LIBOR rate for each Interest Period quoted by the Bank from Bloomberg Financial Markets system (or such other authoritative source as selected by in its sole discretion), which shall be the LIBOR rate for each Interest Period in effect two (2) Banking Days (as defined below) prior to the first day of each Interest Period (rounded upward to the nearest 1/10,000 of 1.00%). Bank may unilaterally adjust LIBOR for any reserve requirement and any subsequent costs arising from a change in government regulation, or may substitute an alternative rate in the event LIBOR becomes unavailable. The Bank's determination of LIBOR is conclusive, absent manifest error. As used in this definition, "Banking Day" means any day other than a Saturday, Sunday or any other day on which banks in London, England or Chicago, Illinois are required or permitted to close.

"LIBOR Loan" or "LIBOR Loans" shall mean that portion, and collectively those portions, of the aggregate outstanding principal balance of the Loans that bear interest at the LIBOR Rate.

"LIBOR Rate" shall mean a per annum rate of interest equal to LIBOR for the relevant Interest Period, plus two and one-half percent (2.50%), which LIBOR Rate shall remain fixed during such Interest Period.

"Lien" shall mean, with respect to any Person, any interest granted by such Person in any real or personal property, asset or other right owned or being purchased or acquired by such Person (including an interest in respect of a Capital Lease) which secures payment or performance of any obligation and shall include any mortgage, lien, encumbrance, title retention lien, charge or other security interest of any kind, whether arising by contract, as a matter of law, by judicial process or otherwise.

"Loan Documents" shall mean the Guaranty and each of the agreements, documents, instruments and certificates set forth in Section 3.1 hereof, and any and all such other instruments, documents, certificates and agreements from time to time executed and delivered by the Borrower or any of its Subsidiaries for the benefit of the Bank pursuant to any of the foregoing, and all amendments, restatements, supplements and other modifications thereto.

"Loans" shall mean, collectively, all Revolving Loans made by the Bank to the Borrower and all Letter of Credit Obligations, under and pursuant to this Agreement.

"Material Adverse Effect" shall mean (a) a material adverse change in, or a material adverse effect upon, the assets, business, properties, prospects, financial condition or

8

results of operations of the Borrower and its Subsidiaries taken as a whole, (b) a material impairment of the ability of the Borrower and its Subsidiaries to perform any of the Obligations under any of the Loan Documents, or (c) a material adverse effect on (i) any substantial portion of the Collateral, (ii) the legality, validity, binding effect or enforceability against the Borrower and its Subsidiaries of any of the Loan Documents, (iii) the perfection or priority of any Lien granted to the Bank under any Loan Document, or (iv) the rights or remedies of the Bank under any Loan Document.

"Net Income" shall mean, with respect to the Borrower and its Subsidiaries for any period, the consolidated net income (or loss) of the Borrower and its Subsidiaries for such period as determined in accordance with GAAP, excluding any gains from Asset Dispositions, any extraordinary gains and any gains from discontinued operations.

"Non-Excluded Taxes" shall have the meaning set forth in Section 2.6(a) hereof.

"Note" shall mean the Revolving Note.

"Obligations" shall mean the Loans, as evidenced by any Note, all interest accrued thereon (including interest which would be payable as post-petition in connection with any bankruptcy or similar proceeding, whether or not permitted as a claim thereunder), any fees due the Bank hereunder, any expenses incurred by the Bank hereunder, including without limitation, all liabilities and obligations under this Agreement, under any other Loan Document, any reimbursement obligations of the Borrower in respect of Letters of Credit and surety bonds, all Hedging Obligations of the Borrower which are owed to the Bank or any Affiliate of the Bank, and all Bank Product Obligations of the Borrower, and any and all other liabilities and obligations owed by the Borrower or Tinsel to the Bank from time to time, howsoever created, arising or evidenced, whether direct or indirect, joint or several, absolute or contingent, now or hereafter existing, or due or to become due, together with any and all renewals, extensions, restatements or replacements of any of the foregoing.

"Obligor" shall mean the Borrower, any Subsidiary of the Borrower, Tinsel, any accommodation endorser, third party pledgor, or any other party liable with respect to the Obligations.

"Organizational Identification Number" means, with respect to Borrower, the organizational identification number assigned to Borrower by the applicable governmental unit or agency of the jurisdiction of organization of the Borrower, if any.

"Other Taxes" shall mean any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies which arise from the execution, delivery, enforcement or registration of, or otherwise with respect to, this Agreement or any of the other Loan Documents.

"Permitted Foreign Deposit Accounts" shall mean one or more Deposit Accounts, now or hereafter maintained by Borrower or a Subsidiary at a bank or other financial institution located in a jurisdiction outside the United States, including without limitation, the Deposit Accounts currently maintained by Santa's Best Limited in the Hong Kong branch or office of JPMorgan Chase Bank and the Bank of China, provided the only funds on deposit in such

9

accounts are deposits made by Borrower or a Subsidiary in the ordinary course of business consistent with past practices for the purpose of funding Borrower's Inventory purchases made in jurisdictions outside the United States.

"Permitted Liens" shall mean (a) Liens for Taxes, assessments or other governmental charges not at the time delinquent or thereafter payable without penalty or being contested in good faith by appropriate proceedings and, in each case, for which it maintains adequate reserves in accordance with GAAP and in respect of which no Lien has been filed; (b) Liens arising in the ordinary course of business (such as (i) Liens of carriers, warehousemen, mechanics and materialmen and other similar Liens imposed by law, and (ii) Liens in the form of deposits or pledges incurred in connection with worker's compensation, unemployment compensation and other types of social security (excluding Liens arising under ERISA) or in connection with surety bonds, bids, performance bonds and similar obligations) for sums not overdue or being contested in good faith by appropriate proceedings and not involving any advances or borrowed money or the deferred purchase price of property or services, which do not in the aggregate materially detract from the value of the property or assets of the Borrower or materially impair the use thereof in the operation of the Borrower's business and, in each case, for which it maintains adequate reserves in accordance with GAAP and in respect of which no Lien has been filed; (c) Liens described on Schedule 9.2 as of the Closing Date; (d) attachments, appeal bonds, judgments and other similar Liens, for sums not exceeding One Thousand and 00/100 Dollars ($1,000.00) arising in connection with court proceedings, provided the execution or other enforcement of such Liens is effectively stayed and the claims secured thereby are being actively contested in good faith and by appropriate proceedings and to the extent such judgments or awards do not constitute an Event of Default under Section 11.8 hereof; (e) easements, rights of way, restrictions, minor defects or irregularities in title and other similar Liens not interfering in any material respect with the ordinary conduct of the business of the Borrower or any of its Subsidiaries; (f) subject to the limitation set forth in Section 9.1(h), Liens arising in connection with Capitalized Lease Obligations (and attaching only to the property being leased); (g) subject to the limitation set forth in Section 9.1(i), Liens that constitute purchase money security interests on any property securing Debt incurred for the purpose of financing all or any part of the cost of acquiring such property, provided that any such Lien attaches to such property within twenty (20) days of the acquisition thereof and attaches solely to the property so acquired; and (h) Liens granted to the Bank hereunder and under the Loan Documents.

"Person" shall mean any natural person, partnership, limited liability company, corporation, trust, joint venture, joint stock company, association, unincorporated organization, government or agency or political subdivision thereof, or other entity, whether acting in an individual, fiduciary or other capacity.

"Prime Loan" or "Prime Loans" shall mean that portion, and collectively, those portions of the aggregate outstanding principal balance of the Loans that bear interest based upon the Prime Rate.

"Prime Rate" shall mean the United States prime rate as published in the "Money Rates" Section of the *Wall Street Journal* (or alternative publication selected by Bank if the *Wall Street Journal* is unavailable or no longer publishes such rate) as of the applicable determination date.

"Regulatory Change" shall mean the introduction of, or any change in any applicable law, treaty, rule, regulation or guideline or in the interpretation or administration thereof by any governmental authority or any central bank or other fiscal, monetary or other authority having jurisdiction over the Bank or its lending office.

"Revolving Interest Rate" shall mean the Borrower's from time to time option of (i) a floating per annum rate of interest equal to the Prime Rate minus one-half of one percent (0.50%) per annum, or (ii) the LIBOR Rate, in each such case not to be less than four and one-half percent (4.5%) per annum.

"Revolving Loan" and "Revolving Loans" shall mean, respectively, each direct advance and the aggregate of all such direct advances made by the Bank to the Borrower under and pursuant to this Agreement, as set forth in Section 2.1 of this Agreement.

"Revolving Loan Availability" shall mean, at any time, an amount equal to the Revolving Loan Commitment minus the Letter of Credit Obligations.

"Revolving Loan Commitment" shall mean the following amounts for the annual periods set forth below:

| Annual Period | Revolving Loan Commitment |
|---|---|
| December 1 to March 31 | $10,000,000 |
| April 1 to November 30 | $20,000,000 |

"Revolving Loan Maturity Date" shall mean July 1, 2017, unless extended by the Bank pursuant to any modification, extension or renewal note executed by the Borrower and accepted by the Bank in its sole and absolute discretion in substitution for the Revolving Note.

"Revolving Note" shall mean that certain Revolving Note of even date herewith in a maximum aggregate principal amount not to exceed $20,000,000 and maturing on the Revolving Loan Maturity Date, duly executed by the Borrower and payable to the order of the Bank, together with any and all renewal, extension, modification or replacement notes executed by the Borrower and delivered to the Bank and given in substitution therefor.

"Senior Debt" shall mean all Debt of the Borrower and its Subsidiaries to the Bank.

"Subordinated Debt" shall mean that portion of the Debt of the Borrower which is subordinated to the Obligations in a manner satisfactory to the Bank, including right and time of payment of principal and interest.

"Subsidiary" and "Subsidiaries" shall mean, respectively, with respect to any Person, each and all such corporations, partnerships, limited partnerships, limited liability companies, limited liability partnerships, joint ventures or other entities of which or in which such Person owns, directly or indirectly, such number of outstanding Capital Securities as have more than fifty percent (50.00%) of the ordinary voting power for the election of directors or other managers of such corporation, partnership, limited liability company or other entity.

Unless the context otherwise requires, each reference to Subsidiaries herein shall be a reference to Subsidiaries of the Borrower.

"Tangible Assets" shall mean the total of all assets appearing on a balance sheet of the Borrower prepared in accordance with GAAP (with Inventory being valued at the lower of cost or market), after deducting all proper reserves (including reserves for Depreciation) minus the sum of (i) goodwill, patents, trademarks, prepaid expenses, deposits, deferred charges and other personal property which is classified as intangible property in accordance with GAAP, and (ii) any amounts due from shareholders, Affiliates, officers or employees of the Borrower.

"Tangible Net Worth" shall mean at any time the total of Tangible Assets minus Liabilities plus Subordinated Debt.

"Taxes" shall mean any and all present and future taxes, duties, levies, imposts, deductions, assessments, charges or withholdings, and any and all liabilities (including interest and penalties and other additions to taxes) with respect to the foregoing.

"UCC" shall mean the Uniform Commercial Code in effect in the state of Illinois from time to time.

"Unmatured Event of Default" shall mean any event which, with the giving of notice, the passage of time or both, would constitute an Event of Default.

"Voidable Transfer" shall have the meaning set forth in Section 13.21 hereof.

"Wholly-Owned Subsidiary" shall mean any Subsidiary of which or in which the Borrower owns, directly or indirectly, one hundred percent (100%) of the Capital Securities of such Subsidiary.

1.2.    Accounting Terms.  Any accounting terms used in this Agreement which are not specifically defined herein shall have the meanings customarily given them in accordance with GAAP.  Calculations and determinations of financial and accounting terms used and not otherwise specifically defined hereunder and the preparation of financial statements to be furnished to the Bank pursuant hereto shall be made and prepared, both as to classification of items and as to amount, in accordance with sound accounting practices and GAAP as used in the preparation of the financial statements of the Borrower on the date of this Agreement.  If any changes in accounting principles or practices from those used in the preparation of the financial statements are hereafter occasioned by the promulgation of rules, regulations, pronouncements and opinions by or required by the Financial Accounting Standards Board or the American Institute of Certified Public Accountants (or any successor thereto or agencies with similar functions), which results in a material change in the method of accounting in the financial statements required to be furnished to the Bank hereunder or in the calculation of financial covenants, standards or terms contained in this Agreement, the parties hereto agree to enter into good faith negotiations to amend such provisions so as equitably to reflect such changes to the end that the criteria for evaluating the financial condition and performance of the Borrower will be the same after such changes as they were before such changes; and if the parties fail to agree on the amendment of such provisions, the Borrower will furnish financial statements in accordance with such changes, but shall provide calculations for all financial covenants, perform

12

all financial covenants and otherwise observe all financial standards and terms in accordance with applicable accounting principles and practices in effect immediately prior to such changes. Calculations with respect to financial covenants required to be stated in accordance with applicable accounting principles and practices in effect immediately prior to such changes shall be reviewed and certified by the Borrower's accountants.

1.3.     Other Terms Defined in UCC.  All other capitalized words and phrases used herein and not otherwise specifically defined herein shall have the respective meanings assigned to such terms in the UCC, to the extent the same are used or defined therein.

1.4.     Other Interpretive Provisions.

(a)     The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.  Whenever the context so requires, the neuter gender includes the masculine and feminine, the single number includes the plural, and vice versa, and in particular the word "Borrower" shall be so construed.

(b)     Section and Schedule references are to this Agreement unless otherwise specified.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(c)     The term "including" is not limiting, and means "including, without limitation".

(d)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including".

(e)     Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement and the other Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, supplements and other modifications thereto, but only to the extent such amendments, restatements, supplements and other modifications are not prohibited by the terms of any Loan Document, and (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation.

(f)     To the extent any of the provisions of the other Loan Documents are inconsistent with the terms of this Agreement, the provisions of this Agreement shall govern.

(g)     This Agreement and the other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters.  All such limitations, tests and measurements are cumulative and each shall be performed in accordance with its terms.

Section 2.    COMMITMENT OF THE BANK.

2.1.    Revolving Loans.

(a)    Revolving Loan Commitment.  Subject to the terms and conditions of this Agreement and the other Loan Documents, and in reliance upon the representations and warranties of the Borrower set forth herein and in the other Loan Documents, the Bank agrees to make such Revolving Loans at such times as the Borrower may from time to time request until, but not including, the Revolving Loan Maturity Date, and in such amounts as the Borrower may from time to time request, provided, however, that the aggregate principal balance of all Revolving Loans outstanding at any time shall not exceed the Revolving Loan Availability.  Revolving Loans made by the Bank may be repaid and, subject to the terms and conditions hereof, borrowed again up to, but not including the Revolving Loan Maturity Date unless the Revolving Loans are otherwise accelerated, terminated or extended as provided in this Agreement. The Revolving Loans shall be used by the Borrower for the purpose of working capital needs.  All revolving loans outstanding under the Prior Loan Agreement shall be deemed outstanding Revolving Loans under this Agreement.

(b)    Revolving Loan Interest and Payments.  Except as otherwise provided in this Section 2.1(b), the principal amount of the Revolving Loans outstanding from time to time shall bear interest at the applicable Revolving Interest Rate.  Accrued and unpaid interest on the unpaid principal balance of all Revolving Loans outstanding from time to time which are Prime Loans, shall be due and payable quarterly, in arrears, commencing on June 30, 2015 and continuing on the last day of each calendar quarter thereafter, and on the Revolving Loan Maturity Date.  Accrued and unpaid interest on the unpaid principal balance of all Revolving Loans outstanding from time to time which are LIBOR Loans shall be payable on the last Business Day of each Interest Period, commencing on the first such date to occur after the date hereof, on the date of any principal repayment of a LIBOR Loan and on the Revolving Loan Maturity Date.  From and after maturity, or after the occurrence and during the continuation of an Event of Default, interest on the outstanding principal balance of the Revolving Loans, at the option of the Bank, may accrue at the Default Rate and shall be payable upon demand from the Bank.

(c)    Revolving Loan Principal Payments.

(i)    Revolving Loan Mandatory Payments.  All Revolving Loans hereunder shall be repaid by the Borrower on the Revolving Loan Maturity Date, unless payable sooner pursuant to the provisions of this Agreement.  In the event the aggregate outstanding principal balance of all Revolving Loans and Letter of Credit Obligations hereunder exceeds the Revolving Loan Availability, the Borrower shall, without notice or demand of any kind, immediately make such repayments of the Revolving Loans or take such other actions as are satisfactory to the Bank as shall be necessary to eliminate such excess.  Also, if the Borrower chooses not to convert any Revolving Loan which is a LIBOR Loan to a Prime Loan as provided in Section 2.2(b) and Section 2.2(c), then such Revolving Loan shall immediately be due and payable on the last Business Day of the then

existing Interest Period or on such earlier date as required by law, all without further demand, presentment, protest or notice of any kind, all of which are hereby waived by the Borrower.

(ii)     Mandatory Clean-Up.  In addition to the foregoing, the Borrower shall make a mandatory prepayment (the "Revolving Loan Mandatory Prepayment") at least one (1) time during each trailing twelve month period ending June 30; provided, however,  such payment must be made on a Business Day and at least thirty (30) days prior to June 30 of such trailing twelve month testing period.  The Revolving Loan Mandatory Prepayment shall be in an amount equal to the then aggregate principal amount of all Revolving Loans outstanding. After the date of the Revolving Loan Mandatory Prepayment, no Revolving Loan shall be made for a period of thirty (30) days.

(iii)     Optional Prepayments.  The Borrower may from time to time prepay the Revolving Loans which are Prime Loans, in whole or in part, without any prepayment penalty whatsoever, provided that any prepayment of the entire principal balance of the Prime Loans shall include accrued interest on such Prime Loans to the date of such prepayment.

2.2.     Additional LIBOR Loan Provisions.

(a)     LIBOR Loan Prepayments.  The principal balance of any LIBOR Loan may be prepaid in whole or in part at any time.  If, for any reason, a LIBOR Loan is paid prior to the last Business Day of any Interest Period, whether voluntary, involuntary, by reason of acceleration or otherwise, each such prepayment of a LIBOR Loan will be accompanied by the amount of accrued interest on the amount prepaid and any and all costs, expenses, penalties and charges incurred by the Bank as a result of the early termination or breakage of a LIBOR Loan, plus the amount, if any, by which (i) the additional interest which would have been payable during the Interest Period on the LIBOR Loan prepaid had it not been prepaid, exceeds (ii) the interest which would have been recoverable by the Bank by placing the amount prepaid on deposit in the domestic certificate of deposit market, the eurodollar deposit market, or other appropriate money market selected by the Bank, for a period starting on the date on which it was prepaid and ending on the last day of the Interest Period for such LIBOR Loan.  The amount of any such loss or expense payable by the Borrower to the Bank under this section shall be determined in the Bank's sole discretion based upon the assumption that the Bank funded its loan commitment for LIBOR Loans in the London Interbank Eurodollar market and using any reasonable attribution or averaging methods which the Bank deems appropriate and practical, provided, however, that the Bank is not obligated to accept a deposit in the London Interbank Eurodollar market in order to charge interest on a LIBOR Loan at the LIBOR Rate.

(b)     LIBOR Unavailability.  If the Bank determines in good faith (which determination shall be conclusive, absent manifest error) prior to the commencement of any Interest Period that (i) the making or maintenance of any LIBOR Loan would violate any applicable law, rule, regulation or directive, whether or not having the force of law,

(ii) United States dollar deposits in the principal amount, and for periods equal to the Interest Period for funding any LIBOR Loan are not available in the London Interbank Eurodollar market in the ordinary course of business, (iii) by reason of circumstances affecting the London Interbank Eurodollar market, adequate and fair means do not exist for ascertaining the LIBOR Rate to be applicable to the relevant LIBOR Loan, or (iv) the LIBOR Rate does not accurately reflect the cost to the Bank of a LIBOR Loan, the Bank shall promptly notify the Borrower thereof and, so long as the foregoing conditions continue, none of the Loans may be advanced as a LIBOR Loan thereafter. In addition, at the Borrower's option, each existing LIBOR Loan shall be immediately (i) converted to a Prime Loan on the last Business Day of the then existing Interest Period, or (ii) due and payable on the last Business Day of the then existing Interest Period, without further demand, presentment, protest or notice of any kind, all of which are hereby waived by the Borrower.

(c) <u>Regulatory Change</u>. In addition, if, after the date hereof, a Regulatory Change shall, in the reasonable determination of the Bank, make it unlawful for the Bank to make or maintain the LIBOR Loans, then the Bank shall promptly notify the Borrower and none of the Loans may be advanced as a LIBOR Loan thereafter. In addition, at the Borrower's option, each existing LIBOR Loan shall be immediately (i) converted to a Prime Loan on the last Business Day of the then existing Interest Period or on such earlier date as required by law, or (ii) due and payable on the last Business Day of the then existing Interest Period or on such earlier date as required by law, all without further demand, presentment, protest or notice of any kind, all of which are hereby waived by the Borrower.

(d) <u>LIBOR Indemnity</u>. If any Regulatory Change, or compliance by the Bank or any Person controlling the Bank with any request or directive of any governmental authority, central bank or comparable agency (whether or not having the force of law) shall (a) impose, modify or deem applicable any assessment, reserve, special deposit or similar requirement against assets held by, or deposits in or for the account of or loans by, or any other acquisition of funds or disbursements by, the Bank; (b) subject the Bank or any LIBOR Loan to any tax, duty, charge, stamp tax or fee or change the basis of taxation of payments to the Bank of principal or interest due from the Borrower to the Bank hereunder (other than a change in the taxation of the overall net income of the Bank); or (c) impose on the Bank any other condition regarding such LIBOR Loan or the Bank's funding thereof, and the Bank shall determine (which determination shall be conclusive, absent manifest error) that the result of the foregoing is to increase the cost to, or to impose a cost on, the Bank or such controlling Person of making or maintaining such LIBOR Loan or to reduce the amount of principal or interest received by the Bank hereunder, then the Borrower shall pay to the Bank or such controlling Person, on demand, such additional amounts as the Bank shall, from time to time, determine are sufficient to compensate and indemnify the Bank for such increased cost or reduced amount.

2.3.   <u>Interest and Fee Computation; Collection of Funds</u>. Except as otherwise set forth herein, all interest and fees shall be calculated on the basis of a year consisting of 360 days and shall be paid for the actual number of days elapsed. Principal payments submitted in funds not

immediately available shall continue to bear interest until collected. If any payment to be made by the Borrower hereunder or under any Note shall become due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in computing any interest in respect of such payment. Notwithstanding anything to the contrary contained herein, the final payment due under any of the Loans must be made by wire transfer or other immediately available funds. All payments made by the Borrower hereunder or under any of the Loan Documents shall be made without setoff, counterclaim, or other defense. To the extent permitted by applicable law, all payments hereunder or under any of the Loan Documents (including any payment of principal, interest, or fees) to, or for the benefit, of any Person shall be made by the Borrower free and clear of, and without deduction or withholding for, or account of, any taxes now or hereinafter imposed by any taxing authority.

2.4.    <u>Late Charge</u>.  If any payment of interest or principal due hereunder is not made within ten (10) days after such payment is due in accordance with the terms hereof, then, in addition to the payment of the amount so due, the Borrower shall pay to the Bank a "late charge" equal to the greater of (a) five cents for each whole dollar so overdue or (b) Twenty-Five and no/100 Dollars ($25.00) to defray part of the cost of collection and handling such late payment. The Borrower agrees that the damages to be sustained by the Bank for the detriment caused by any late payment are extremely difficult and impractical to ascertain, and that such late charge is a reasonable estimate of such damages, does not constitute interest, and is not a penalty.

2.5.    <u>Letters of Credit</u>.

(a)    <u>General Terms</u>.    Subject to the terms and conditions of the Loan Documents, prior to the Revolving Loan Maturity Date, Bank shall, from time to time cause to be issued and co-sign for or otherwise guarantee, upon Borrower's request, commercial and/or standby Letters of Credit; provided, that the aggregate undrawn face amount of all such Letters of Credit shall at no time exceed the Letter of Credit Commitment. Payments made by the issuer of a Letter of Credit to any Person on account of any Letter of Credit shall be immediately payable by Borrower without notice, presentment or demand and Borrower agrees that each payment made by the issuer of a Letter of Credit in respect of a Letter of Credit shall constitute a request by Borrowers for a Loan to reimburse such issuer. In the event such Loan is not advanced by Bank for any reason, such reimbursement obligations (whether owing to the issuer of the Letter of Credit or Bank if Bank is not the issuer) shall become part of the Obligations hereunder and shall bear interest at the rate then applicable to Revolving Loans until repaid. Borrower shall remit to Bank a Letter of Credit fee equal to the Letter of Credit Fee Amount in accordance with Section 5.3 of this Agreement.

(b)    <u>Requests for Letters of Credit</u>.  Borrower shall make requests for Letters of Credit in writing at least two (2) Business Days prior to the date such Letter of Credit is to be issued. Each such request shall specify the date such Letter of Credit is to be issued, the amount thereof, the name and address of the beneficiary thereof and a description of the transaction to be supported thereby. Any such notice shall be accompanied by the form of Letter of Credit requested and any application or reimbursement agreement required by the issuer of such Letter of Credit.

(c)     Obligations Absolute.  Borrower shall be obligated to reimburse the issuer of any Letter of Credit, or Bank if Bank has reimbursed such issuer on Borrower's behalf, for any payments made in respect of any Letter of Credit, which obligation shall be unconditional and irrevocable and shall be paid regardless of: (a) any lack of validity or enforceability of any Letter of Credit, (b) any amendment or waiver of or consent or departure from all or any provisions of any Letter of Credit, this Agreement or any other Loan Document, (c) the existence of any claim, set off, defense or other right which Borrower or any other Person may have against any beneficiary of any Letter of Credit, Bank or the issuer of the Letter of Credit, (d) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid, or insufficient in any respect or any statement therein being untrue or inaccurate in any respect, (e) any payment under any Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, and (f) any other act or omission to act or delay of any kind of the issuer of such Letter of Credit, the Bank or any other Person or any other event or circumstance that might otherwise constitute a legal or equitable discharge of Borrower's obligations hereunder.  It is understood and agreed by Borrower that the issuer of any Letter of Credit may accept documents that appear on their face to be in order without further investigation or inquiry, regardless of any notice or information to the contrary.

(d)     Expiration Dates of Letters of Credit.  The expiration date of each Letter of Credit shall be no later than the Letter of Credit Maturity Date.  Notwithstanding the foregoing, a Letter of Credit may provide for automatic extensions of its expiration date for one or more one (1) year periods, so long as the issuer thereof has the right to terminate the Letter of Credit at the end of each one (1) year period and no extension period extends past the Revolving Loan Maturity Date.

(e)     LC Agreement.  In connection with the execution of this Agreement, Borrower and Bank are entering into a LC Agreement.  To the extent any of the terms of Section 2.5 of this Agreement conflict with the terms of the LC Agreement, the terms of this Agreement will control.

(f)     Additional Letter of Credit Requirements.  Borrower and Bank agree that each draw under any Letter of Credit shall constitute a request for, and shall be repaid by, a direct advance under the Revolving Loan on the date of such draw.  If, for any reason, there is not sufficient availability for a direct advance under the Revolving Loan, Borrower shall pay Bank the amount due promptly upon demand by Bank.  Each Letter of Credit requested by Borrower shall be issued by Bank only after Bank has received a fully executed LC Agreement on Bank's standard form.  If any Letter of Credit is not returned or cancelled, or remains outstanding as of the Revolving Loan Maturity Date, Borrower shall provide Bank with cash collateral in form and substance acceptable to Bank in an amount equal to one hundred percent (100%) of the aggregate amount of the Letter of Credit Obligations.  After all undrawn Letters of Credit issued hereunder have expired, been cancelled, been drawn upon and paid, Bank shall release its lien on said cash collateral.

2.6.     Taxes.

(a)     All payments made by the Borrower under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority, excluding net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on the Bank as a result of a present or former connection between the Bank and the jurisdiction of the governmental authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Bank having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document). If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings (collectively, "Non-Excluded Taxes") or Other Taxes are required to be withheld from any amounts payable to the Bank hereunder, the amounts so payable to the Bank shall be increased to the extent necessary to yield to the Bank (after payment of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement, provided, however, that the Borrower shall not be required to increase any such amounts payable to the Bank with respect to any Non-Excluded Taxes that are attributable to the Bank's failure to comply with the requirements of subsection 2.6(c).

(b)     The Borrower shall pay any Other Taxes to the relevant governmental authority in accordance with applicable law.

(c)     At the request of the Borrower and at the Borrower's sole cost, the Bank shall take reasonable steps to (i) contest its liability for any Non-Excluded Taxes or Other Taxes that have not been paid, or (ii) seek a refund of any Non-Excluded Taxes or Other Taxes that have been paid.

(d)     Whenever any Non-Excluded Taxes or Other Taxes are payable by the Borrower, as promptly as possible thereafter the Borrower shall send to the Bank a certified copy of an original official receipt received by the Borrower showing payment thereof. If the Borrower fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the Bank the required receipts or other required documentary evidence or if any governmental authority seeks to collect a Non-Excluded Tax or Other Tax directly from the Bank for any other reason, the Borrower shall indemnify the Bank on an after-tax basis for any incremental taxes, interest or penalties that may become payable by the Bank.

(e)     The agreements in this Section shall survive the satisfaction and payment of the Obligations and the termination of this Agreement.

2.7.     All Loans to Constitute Single Obligation. The Loans shall constitute one general obligation of the Borrower, and shall be secured by Bank's priority security interest in and Lien upon all of the Collateral and by all other security interests, Liens, claims and encumbrances

heretofore, now or at any time or times hereafter granted by the Borrower and/or any Subsidiary to Bank.

Section 3.     CONDITIONS OF BORROWING.

Notwithstanding any other provision of this Agreement, the Bank shall not be required to disburse, make or continue all or any portion of the Loans, if any of the following conditions shall have occurred.

3.1.     Loan Documents. The Borrower shall have failed to execute and deliver to the Bank any of the following Loan Documents, all of which must be satisfactory to the Bank and the Bank's counsel in form, substance and execution:

(a)     Loan Agreement. Two copies of this Agreement duly executed by the Borrower.

(b)     Revolving Note. A Revolving Note duly executed by the Borrower, in the form prepared by and acceptable to the Bank.

(c)     LC Agreement. A LC Agreement prepared by and acceptable to the Bank, duly executed by the Borrower in favor of the Bank.

(d)     Collateral Access Agreement. If requested by Lender, Collateral Access Agreements from the owner, lessor or mortgagee, as the case may be, of any real estate whereon any Collateral is stored or otherwise located in the United States, in the form prepared by and acceptable to the Bank.

(e)     Search Results; Lien Terminations. Copies of UCC search reports dated such a date as is acceptable to the Bank, listing all effective financing statements which name the Borrower and any of its Subsidiaries under their present names and any previous names, as debtors, together with (i) copies of such financing statements, (ii) payoff letters evidencing repayment in full of all existing Debt to be repaid with the Loans, the termination of all agreements relating thereto and the release of all Liens granted in connection therewith, with UCC or other appropriate termination statements and documents effective to evidence the foregoing (other than Permitted Liens), and (iii) such other UCC termination statements as the Bank may reasonably request.

(f)     Organizational and Authorization Document. Copies of (i) the Partnership Agreement of the Borrower and the applicable organizational documents for each of its Subsidiaries; (ii) resolutions of the general partners of the Borrower and applicable resolutions for each of its Subsidiaries approving and authorizing such Person's execution, delivery and performance of the Loan Documents to which it is party and the transactions contemplated thereby; (iii) signature and incumbency certificates of the officers of the Borrower and each of its Subsidiaries, executing any of the Loan Documents, each of which the Borrower hereby certifies to be true and complete, and in full force and effect without modification, it being understood that the Bank may conclusively rely on each such document and certificate until formally advised by the Borrower of any changes therein; and (iv) good standing certificates in the state of

organization of the Borrower, if applicable, and each of its Subsidiaries and in each other state requested by the Bank.

(g)     Insurance.  Evidence satisfactory to the Bank of the existence of insurance required to be maintained pursuant to Section 8.6, together with evidence that the Bank has been named as a lender's loss payee on all related insurance policies.

(h)     Additional Documents.  Such other certificates, financial statements, schedules, resolutions, opinions of counsel, notes and other documents which are provided for hereunder or which the Bank shall require.

3.2.    Event of Default.  Any Event of Default shall have occurred and be continuing.

3.3.    Material Adverse Effect.  The occurrence of any event having a Material Adverse Effect upon the Borrower.

3.4.    Litigation.  Any litigation or governmental proceeding shall have been instituted against the Borrower or any of its officers or partners having a Material Adverse Effect upon the Borrower.

3.5.    Representations and Warranties.  Any representation or warranty of the Borrower contained herein or in any Loan Document shall be untrue or incorrect in any material respect as of the date of any Loan as though made on such date, except to the extent such representation or warranty expressly relates to an earlier date.

Section 4.     REVOLVING NOTE.  The Revolving Loans and the Letter of Credit Obligations shall be evidenced by the Revolving Note.  At the time of the initial disbursement of a Revolving Loan and at each time any additional Revolving Loan shall be requested hereunder or a repayment made in whole or in part thereon, a notation thereof shall be made on the books and records of the Bank.  All amounts recorded shall be, absent manifest error, conclusive and binding evidence of (i) the principal amount of the Revolving Loans advanced hereunder and the amount of all Letter of Credit Obligations, (ii) any accrued and unpaid interest owing on the Revolving Loans, and (iii) all amounts repaid on the Revolving Loans or the Letter of Credit Obligations.  The failure to record any such amount or any error in recording such amounts shall not, however, limit or otherwise affect the obligations of the Borrower under the Revolving Note to repay the principal amount of the Revolving Loans, together with all interest accruing thereon.

Section 5.     MANNER OF BORROWING.

5.1.    Borrowing Procedures.  Each Revolving Loan may be advanced either as a Prime Loan or a LIBOR Loan.  Each Loan shall be made available to the Borrower upon any written, verbal, electronic, telephonic or telecopy loan request which the Bank in good faith believes to emanate from a properly authorized representative of the Borrower, whether or not that is in fact the case.  Each such request shall be effective upon receipt by the Bank, shall be irrevocable, and shall specify the date, amount and type of borrowing and, in the case of a LIBOR Loan, the initial Interest Period therefor.  The Borrower shall select Interest Periods so as not to require a payment or prepayment of any LIBOR Loan during an Interest Period for such LIBOR Loan.  The final Interest Period for any LIBOR Loan must be such that its expiration occurs on or

before the Revolving Loan Maturity Date of such Loan. A request for a Prime Loan must be received by the Bank no later than 1:00 p.m. Chicago, Illinois time, on the day it is to be funded. A request for a LIBOR Loan must be (i) received by the Bank no later than 1:00 p.m. Chicago, Illinois time, three days before the day it is to be funded, and (ii) in an amount equal to One Hundred Thousand and 00/100 Dollars ($100,000.00) or a higher integral multiple of One Hundred Thousand and 00/100 Dollars ($100,000.00). The proceeds of each Loan shall be made available at the office of the Bank by credit to the account of the Borrower or by other means requested by the Borrower and acceptable to the Bank. The Borrower does hereby irrevocably confirm, ratify and approve all such advances by the Bank and does hereby indemnify the Bank against losses and expenses (including court costs, reasonable attorneys' and paralegals' fees) and shall hold the Bank harmless with respect thereto.

5.2. <u>LIBOR Conversion and Continuation Procedures</u>. If pursuant to the notice received by the Bank pursuant to <u>Section 5.1</u>, the initial Interest Period of any LIBOR Loan commences on any day other than the first Business Day of any month, then the initial Interest Period of such LIBOR Loan shall end on the first Business Day of the following calendar month, notwithstanding the Interest Period specified in such notice, and the LIBOR Rate for such LIBOR Loan shall be equal to the LIBOR Rate for an Interest Period equal to the length of such partial month. Thereafter, each LIBOR Loan shall automatically renew for the Interest Period specified in the initial request received by the Bank pursuant to <u>Section 5.1</u>, at the then current LIBOR Rate until the Borrower, pursuant to a subsequent written notice received by the Bank, shall elect the conversion of all or a portion of such LIBOR Loan to a Prime Loan. Each Interest Period occurring after the initial Interest Period with respect to any LIBOR Loan shall commence on the same day of each applicable month as the first day of the initial Interest Period. Whenever the last day of any Interest Period with respect to any LIBOR Loan would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day. Whenever an Interest Period with respect to any LIBOR Loan would otherwise end on a day of a month for which there is no numerically corresponding day in the calendar month, such Interest Period shall end on the last day of such calendar month, unless such day is not a Business Day, in which event such Interest Period shall be extended to end on the next Business Day. Upon receipt by the Bank of such subsequent notice, the Borrower may, subject to the terms and conditions of this Agreement, elect, as of the last day of the applicable Interest Period, to convert any such LIBOR Loan to a Prime Loan. Such notice shall, in the case of a conversion to a Prime Loan, be given before 1:00 p.m., Chicago time, on the proposed date of such conversion, and in the case of conversion to a LIBOR Loan, be given before 1:00 p.m., Chicago time, at least three Business Days prior to the proposed date of such conversion, specifying: (i) the proposed date of conversion; (ii) the aggregate amount of Loans to be converted; (iii) the type of Loans resulting from the proposed conversion; and (iv) the requested Interest Period. If the Revolving Loans are subject to a Revolving Loan Mandatory Prepayment, the last day of the then current Interest Period for all Revolving Loans which are LIBOR Loans must coincide with the date of the Revolving Loan Mandatory Prepayment. The Borrower may not elect a LIBOR Rate, and an Interest Period for a LIBOR Loan shall not automatically renew, with respect to any principal amount which is scheduled to be repaid before the last day of the applicable Interest Period, and any such amounts shall bear interest at the Prime Rate <u>minus</u> one-half of one percent (0.50%) until repaid.

5.3.    Letters of Credit.  All Letters of Credit shall bear such application, issuance, renewal, negotiation and other fees and charges, and bear such interest as charged by the Bank or otherwise payable pursuant to the LC Agreement.  In addition to the foregoing, each standby Letters of Credit issued under and pursuant to this Agreement shall bear an annual issuance fee equal to one percent (1.00%) of the face amount of such standby Letter of Credit (the "Letter of Credit Fee Amount"), payable by the Borrower prior to the issuance by the Bank of such Letter of Credit and annually thereafter, until (i) such Letter of Credit has expired or has been returned to the Bank, or (ii) the Bank has paid the beneficiary thereunder the full face amount of such Letter of Credit.  Said fee shall be calculated on the basis of a 360 day year.  Borrower shall also pay on demand the normal and customary administrative charges of the issuer of the Letter of Credit for issuance, amendment, negotiation, renewal or extension of any Letter of Credit to the extent required pursuant to the terms of the Letter of Credit Applications or LC Agreement.

5.4.    Automatic Debit.  In order to effectuate the timely payment of any of the Obligations when due, the Borrower hereby authorizes and directs the Bank, at the Bank's option, to (a) debit the amount of the Obligations to any ordinary deposit account of the Borrower, or (b) make a Revolving Loan hereunder to pay the amount of the Obligations.

5.5.    Discretionary Disbursements.  The Bank, in its sole and absolute discretion, may immediately upon notice to the Borrower, disburse any or all proceeds of the Loans made or available to the Borrower pursuant to this Agreement to pay any fees, costs, expenses or other amounts required to be paid by the Borrower hereunder and not so paid.  All monies so disbursed shall be a part of the Obligations, payable by the Borrower on demand from the Bank.

Section 6.    SECURITY FOR THE OBLIGATIONS.

6.1.    Security for Obligations.  As security for the payment and performance of the Obligations, Borrower hereby reaffirms its prior grant to Bank of all security interests and liens in and to Borrower's assets as set forth in the Prior Loan Agreement and Borrower does hereby pledge, assign, transfer, deliver and grant to the Bank, for its own benefit and as agent for its Affiliates, a continuing and unconditional first priority security interest in and to any and all property of the Borrower, of any kind or description, tangible or intangible, wheresoever located and whether now existing or hereafter arising or acquired, including the following (all of which property, along with the products and proceeds therefrom, are individually and collectively referred to as the "Collateral"):

(a)    all property of, or for the account of, the Borrower now or hereafter coming into the possession, control or custody of, or in transit to, the Bank or any agent or bailee for the Bank or any parent, Affiliate or Subsidiary of the Bank or any participant with the Bank in the Loans (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise), including all earnings, dividends, interest, or other rights in connection therewith and the products and proceeds therefrom, including the proceeds of insurance thereon; and

(b)    the additional property of the Borrower, whether now existing or hereafter arising or acquired, and wherever now or hereafter located, together with all additions and accessions thereto, substitutions, betterments and replacements therefor, products and

proceeds therefrom, and all of the Borrower's books and records and recorded data relating thereto (regardless of the medium of recording or storage), together with all of the Borrower's right, title and interest in and to all computer software required to utilize, create, maintain and process any such records or data on electronic media, identified and set forth as follows:

(i)     All Accounts and all Goods whose sale, lease or other disposition by the Borrower has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, the Borrower, or rejected or refused by an Account Debtor;

(ii)     All Inventory, including raw materials, work-in-process and finished goods;

(iii)     All Goods (other than Inventory), including embedded software, Equipment, vehicles, furniture and Fixtures;

(iv)     All Software and computer programs;

(v)     All Investment Property, financial assets and Deposit Accounts;

(vi)     All Chattel Paper, Electronic Chattel Paper, Instruments, Documents, Letter of Credit Rights, all proceeds of letters of credit, Health-Care-Insurance Receivables, Supporting Obligations, notes secured by real estate, Commercial Tort Claims and General Intangibles, including Payment Intangibles; and

(vii)     All Proceeds (whether cash proceeds or noncash proceeds) of the foregoing property, including all insurance policies and proceeds of insurance payable by reason of loss or damage to the foregoing property, including unearned premiums, and of eminent domain or condemnation awards.

6.2.     <u>Possession and Transfer of Collateral</u>.     Unless an Event of Default exists hereunder, the Borrower shall be entitled to possession or use of the Collateral (other than Instruments or Documents, Tangible Chattel Paper, Investment Property consisting of certificated securities and other Collateral required to be delivered to the Bank pursuant to this <u>Section 6</u>).  The cancellation or surrender of any Note, upon payment or otherwise, shall not affect the right of the Bank to retain the Collateral for any other of the Obligations.  The Borrower shall not sell, assign (by operation of law or otherwise), license, lease or otherwise dispose of, or grant any option with respect to any of the Collateral, except that the Borrower may sell Inventory in the ordinary course of business.

6.3.     <u>Financing Statements</u>.  The Borrower shall, at the Bank's request, at any time and from time to time, execute and deliver to the Bank such financing statements, amendments and other documents and do such acts as the Bank deems necessary in order to establish and maintain valid, attached and perfected first priority security interests in the Collateral in favor of the Bank, free and clear of all Liens and claims and rights of third parties whatsoever, except Permitted Liens.  The Borrower hereby irrevocably authorizes the Bank at any time, and from time to time,

to file in any jurisdiction any initial financing statements and amendments thereto without the signature of the Borrower that (a) indicate the Collateral (i) is comprised of all assets of the Borrower or words of similar effect, regardless of whether any particular asset comprising a part of the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of the jurisdiction wherein such financing statement or amendment is filed, or (ii) as being of an equal or lesser scope or within greater detail as the grant of the security interest set forth herein, and (b) contain any other information required by Section 5 of Article 9 of the Uniform Commercial Code of the jurisdiction wherein such financing statement or amendment is filed regarding the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Borrower is an organization, the type of organization and any Organizational Identification Number issued to the Borrower, and (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of the real property to which the Collateral relates. The Borrower hereby agrees that a photocopy or other reproduction of this Agreement is sufficient for filing as a financing statement and the Borrower authorizes the Bank to file this Agreement as a financing statement in any jurisdiction. The Borrower agrees to furnish any such information to the Bank promptly upon request. The Borrower further ratifies and affirms its authorization for any financing statements and/or amendments thereto, executed and filed by the Bank in any jurisdiction prior to the date of this Agreement. In addition, the Borrower shall make appropriate entries on its books and records disclosing the Bank's security interests in the Collateral.

6.4.    Additional Collateral.  The Borrower shall deliver to the Bank immediately upon its demand, such other collateral as the Bank may from time to time request, should the value of the Collateral, in the Bank's sole and absolute discretion, decline, deteriorate, depreciate or become impaired, and does hereby grant to the Bank a continuing security interest in such other collateral, which, when pledged, assigned and transferred to the Bank shall be and become part of the Collateral. The Bank's security interests in all of the foregoing Collateral shall be valid, complete and perfected whether or not covered by a specific assignment.

6.5.    Preservation of the Collateral.  The Bank may, but is not required, to take such actions from time to time as the Bank deems appropriate to maintain or protect the Collateral. The Bank shall have exercised reasonable care in the custody and preservation of the Collateral if the Bank takes such action as the Borrower shall reasonably request in writing which is not inconsistent with the Bank's status as a secured party, but the failure of the Bank to comply with any such request shall not be deemed a failure to exercise reasonable care; provided, however, the Bank's responsibility for the safekeeping of the Collateral shall (i) be deemed reasonable if such Collateral is accorded treatment substantially equal to that which the Bank accords its own property, and (ii) not extend to matters beyond the control of the Bank, including acts of God, war, insurrection, riot or governmental actions. In addition, any failure of the Bank to preserve or protect any rights with respect to the Collateral against prior or third parties, or to do any act with respect to preservation of the Collateral, not so requested by the Borrower, shall not be deemed a failure to exercise reasonable care in the custody or preservation of the Collateral. The Borrower shall have the sole responsibility for taking such action as may be necessary, from time to time, to preserve all rights of the Borrower and the Bank in the Collateral against prior or third parties. Without limiting the generality of the foregoing, where Collateral consists in whole or in part of securities, the Borrower represents to, and covenants with, the Bank that the Borrower has made arrangements for keeping informed of changes or potential changes affecting the securities

(including rights to convert or subscribe, payment of dividends, reorganization or other exchanges, tender offers and voting rights), and the Borrower agrees that the Bank shall have no responsibility or liability for informing the Borrower of any such or other changes or potential changes or for taking any action or omitting to take any action with respect thereto.

6.6.    Other Actions as to any and all Collateral.  The Borrower further agrees to take any other action reasonably requested by the Bank to ensure the attachment, perfection and first priority of, and the ability of the Bank to enforce, the Bank's security interest in any and all of the Collateral, including (a) causing the Bank's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the bank to enforce, the Bank's security interest in such Collateral, (b) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Bank to enforce, the Bank's security interest in such Collateral, (c) obtaining governmental and other third party consents and approvals, including any consent of any licensor, lessor or other Person obligated on Collateral, (d) upon Bank's request, obtaining Collateral Access Agreements to the extent required under this Agreement in form and substance satisfactory to the Bank, and (e) taking all actions required by the UCC in effect from time to time or by other law, as applicable in any relevant UCC jurisdiction, or by other law as applicable in any foreign jurisdiction.  The Borrower further agrees to indemnify and hold the Bank harmless against claims of any Persons not a party to this Agreement concerning disputes arising over the Collateral.

6.7.    Collateral in the Possession of a Warehouseman or Bailee.  If any of the Collateral at any time is in the possession of a warehouseman or bailee in the United States, the Borrower shall promptly notify the Bank thereof, and shall promptly upon Lender's request obtain a Collateral Access Agreement.  The Bank agrees with the Borrower that the Bank shall not give any instructions to such warehouseman or bailee pursuant to such Collateral Access Agreement unless an Event of Default has occurred and is continuing, or would occur after taking into account any action by the Borrower with respect to the warehouseman or bailee.

6.8.    Intentionally omitted.

6.9.    Letter-of-Credit Rights.  If the Borrower at any time is a beneficiary under a letter of credit now or hereafter issued in favor of the Borrower, the Borrower shall promptly notify the Bank thereof and, at the request and option of the Bank, the Borrower shall, pursuant to an agreement in form and substance satisfactory to the Bank, either (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to the Bank of the proceeds of any drawing under the letter of credit, or (ii) arrange for the Bank to become the transferee beneficiary of the letter of credit, with the Bank agreeing, in each case, that the proceeds of any drawing under the letter to credit are to be applied as provided in this Agreement.

6.10.    Commercial Tort Claims.  If the Borrower shall at any time hold or acquire a Commercial Tort Claim, the Borrower shall immediately notify the Bank in writing signed by the Borrower of the details thereof and grant to the Bank in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, in each case in form

and substance satisfactory to the Bank, and shall execute any amendments hereto deemed reasonably necessary by the Bank to perfect its security interest in such Commercial Tort Claim.

6.11.   Electronic Chattel Paper and Transferable Records.  If the Borrower at any time holds or acquires an interest in any electronic chattel paper or any "transferable record", as that term is defined in Section 201 of the federal Electronic Signatures in Global and National Commerce Act, or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, the Borrower shall promptly notify the Bank thereof and, at the request of the Bank, shall take such action as the Bank may reasonably request to vest in the Bank control under Section 9-105 of the UCC of such electronic chattel paper or control under Section 201 of the federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record.   The Bank agrees with the Borrower that the Bank will arrange, pursuant to procedures satisfactory to the Bank and so long as such procedures will not result in the Bank's loss of control, for the Borrower to make alterations to the electronic chattel paper or transferable record permitted under Section 9-105 of the UCC or, as the case maybe, Section 201 of the federal Electronic Signatures in Global and National Commerce Act or Section 16 of the Uniform Electronic Transactions Act for a party in control to make without loss of control.

Section 7.      REPRESENTATIONS AND WARRANTIES.

To induce the Bank to make the Loans, the Borrower makes the following representations and warranties to the Bank, each of which shall survive the execution and delivery of this Agreement:

7.1.   Borrower Organization and Name.  The Borrower is a general partnership duly organized, existing and in good standing under the laws of the State of Illinois, with full and adequate power to carry on and conduct its business as presently conducted and each Subsidiary is validly existing and in good standing under the laws of the jurisdiction of its organization. The Borrower and each Subsidiary is duly licensed or qualified in all foreign jurisdictions wherein the nature of its activities require such qualification or licensing, except for such jurisdictions where the failure to so qualify would not have a Material Adverse Effect.  The Borrower's Organizational Identification Number is: None.  The exact legal name of the Borrower is as set forth in the first paragraph of this Agreement, and the Borrower currently does not conduct, nor has it during the last five (5) years conducted, business under any other name or trade name, except that the commercial lighting division of Borrower conducts business under the name "Christmas USA".

7.2.   Authorization.  The Borrower has full right, power and authority to enter into this Agreement, to make the borrowings and execute and deliver the Loan Documents as provided herein and to perform all of its duties and obligations under this Agreement and the other Loan Documents.  The execution and delivery of this Agreement and the other Loan Documents will not, nor will the observance or performance of any of the matters and things herein or therein set forth, violate or contravene any provision of law or of the partnership agreement of the Borrower.  All necessary and appropriate action has been taken on the part of the Borrower to authorize the execution and delivery of this Agreement and the Loan Documents.

27

7.3. <u>Validity and Binding Nature</u>. This Agreement and the other Loan Documents are the legal, valid and binding obligations of the Borrower, enforceable against the Borrower in accordance with their terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity.

7.4. <u>Consent; Absence of Breach</u>. The execution, delivery and performance of this Agreement, the other Loan Documents and any other documents or instruments to be executed and delivered by the Borrower in connection with the Loans, and the borrowings by the Borrower hereunder, do not and will not (a) require any consent, approval, authorization of, or filings with, notice to or other act by or in respect of, any governmental authority or any other Person (other than any consent or approval which has been obtained and is in full force and effect); (b) conflict with (i) any provision of law or any applicable regulation, order, writ, injunction or decree of any court or governmental authority, (ii) the partnership agreement of the Borrower or the organizational documents of any of its Subsidiaries, or (iii) any material agreement, indenture, instrument or other document, or any judgment, order or decree, which is binding upon the Borrower or any of its Subsidiaries or any of their respective properties or assets; or (c) require, or result in, the creation or imposition of any Lien on any asset of Borrower or any of its Subsidiaries, other than Liens in favor of the Bank created pursuant to this Agreement.

7.5. <u>Ownership of Properties; Liens</u>. The Borrower is the sole owner or has other rights in all of its properties and assets, real and personal, tangible and intangible, of any nature whatsoever (including patents, trademarks, trade names, service marks and copyrights), free and clear of all Liens, charges and claims (including infringement claims with respect to patents, trademarks, service marks, copyrights and the like), other than Permitted Liens.

7.6. <u>Equity Ownership</u>. All issued and outstanding Capital Securities of the Borrower and each of its Subsidiaries are duly authorized and validly issued, fully paid, non-assessable, and free and clear of all Liens other than those in favor of the Bank, if any, and such securities were issued in compliance with all applicable state and federal laws concerning the issuance of securities. As of the date hereof, there are no pre-emptive or other outstanding rights, options, warrants, conversion rights or other similar agreements or understandings for the purchase or acquisition of any Capital Securities of the Borrower and each of its Subsidiaries.

7.7. <u>Intellectual Property</u>. The Borrower owns and possesses or has a license or other right to use all Intellectual Property, as are necessary for the conduct of the businesses of the Borrower, without any infringement upon rights of others which could reasonably be expected to have a Material Adverse Effect upon the Borrower, and no material claim has been asserted and is pending by any Person challenging or questioning the use of any Intellectual Property or the validity or effectiveness of any Intellectual Property nor does the Borrower know of any valid basis for any such claim.

7.8. <u>Financial Statements</u>. All financial statements submitted to the Bank have been prepared in accordance with sound accounting practices and GAAP on a basis, except as otherwise noted therein, consistent with the previous fiscal year and present fairly the financial condition of the Borrower and the results of the operations for the Borrower as of such date and for the periods indicated. Since the date of the most recent financial statement submitted by the

Borrower to the Bank, there has been no change in the financial condition or in the assets or liabilities of the Borrower having a Material Adverse Effect on the Borrower.

7.9. <u>Litigation and Contingent Liabilities</u>. There is no litigation, arbitration proceeding, demand, charge, claim, petition or governmental investigation or proceeding pending, or to the knowledge of the Borrower, threatened, against the Borrower, which, if adversely determined, which might reasonably be expected to have a Material Adverse Effect upon the Borrower, except as set forth in <u>Schedule 7.9</u>. Other than any liability incident to such litigation or proceedings, and except for the Guaranty, the Borrower has no material guarantee obligations, contingent liabilities, liabilities for taxes, or any long-term leases or unusual forward or long-term commitments, including any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, that are not fully-reflected or fully reserved for in the most recent audited financial statements delivered pursuant to subsection 8.8(a) or fully-reflected or fully reserved for in the most recent quarterly financial statements delivered pursuant to subsection 8.8(b) and not permitted by <u>Section 9.1</u>.

7.10. <u>Event of Default</u>. No Event of Default or Unmatured Event of Default exists or would result from the incurrence by the Borrower of any of the Obligations hereunder or under any of the other Loan Documents, and the Borrower is not in default (with regard to grace or cure periods) under any other material contract or agreement to which it is a party.

7.11. <u>Adverse Circumstances</u>. No condition, circumstance, event, agreement, document, instrument, restriction, litigation or proceeding (or to the best of Borrower's knowledge, threatened litigation or proceeding or basis therefor) exists which (a) would have a Material Adverse Effect upon the Borrower, or (b) would constitute an Event of Default or an Unmatured Event of Default.

7.12. <u>Environmental Laws and Hazardous Substances</u>. The Borrower has not generated, used, stored, treated, transported, manufactured, handled, produced or disposed of any Hazardous Substances, on or off any of the premises of the Borrower (whether or not owned by it) in any manner which at any time violates in any material respect any Environmental Law or any license, permit, certificate, approval or similar authorization thereunder. The Borrower will comply in all material respects with all Environmental Laws and will obtain all licenses, permits certificates, approvals and similar authorizations thereunder. There has been no investigation, proceeding, complaint, order, directive, claim, citation or notice by any governmental authority or any other Person, nor is any pending or, to the best of the Borrower's knowledge, threatened, and the Borrower shall promptly notify the Bank upon becoming aware of any such investigation, proceeding, complaint, order, directive, claim, citation or notice, and shall take prompt and appropriate actions to respond thereto, with respect to any non-compliance with, or violation of, the requirements of any Environmental Law by the Borrower or the release, spill or discharge, threatened or actual, of any Hazardous Substances or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Substances or any other environmental, health or safety matter, which affects the Borrower or its business, operations or assets or any properties at which the Borrower has transported, stored or disposed of any Hazardous Substances. To the best of the Borrower's knowledge, the Borrower has no material liability, contingent or otherwise, in connection with a release, spill or discharge, threatened or actual, of any Hazardous Substances or the generation, use, storage, treatment,

transportation, manufacture, handling, production or disposal of any Hazardous Substances. The Borrower further agrees to allow the Bank or its agent access to the properties of the Borrower and its Subsidiaries to confirm compliance with all Environmental Laws, and the Borrower shall, following determination by the Bank that there is material non-compliance, or any condition which requires any action by or on behalf of the Borrower in order to avoid any material non-compliance, with any Environmental Law, at the Borrower's sole expense, cause an independent environmental engineer acceptable to the Bank to conduct such tests of the relevant site as are appropriate, and prepare and deliver a report setting forth the result of such tests, a proposed plan for remediation and an estimate of the costs thereof.

7.13. <u>Solvency, etc</u>. As of the date hereof, and immediately prior to and after giving effect to the issuance of each Letter of Credit and each Loan hereunder and the use of the proceeds thereof, (a) the fair value of the Borrower's assets is greater than the amount of its liabilities (including disputed, contingent and unliquidated liabilities) as such value is established and liabilities evaluated as required under the Section 548 of the Bankruptcy Code, (b) the present fair saleable value of the Borrower's assets is not less than the amount that will be required to pay the probable liability on its debts as they become absolute and matured, (c) the Borrower is able to realize upon its assets and pay its debts and other liabilities (including disputed, contingent and unliquidated liabilities) as they mature in the normal course of business, (d) the Borrower does not intend to, and does not believe that it will, incur debts or liabilities beyond its ability to pay as such debts and liabilities mature, and (e) the Borrower is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which its property would constitute unreasonably small capital.

7.14. <u>ERISA Obligations</u>. All Employee Plans of the Borrower meet the minimum funding standards of Section 302 of ERISA and 412 of the Internal Revenue Code where applicable, and each such Employee Plan that is intended to be qualified within the meaning of Section 401 of the Internal Revenue Code of 1986 is qualified. No withdrawal liability has been incurred under any such Employee Plans and no "Reportable Event" or "Prohibited Transaction" as such terms are defined in ERISA has occurred with respect to any such Employee Plans, unless approved by the appropriate governmental agencies. The Borrower has promptly paid and discharged all obligations and liabilities arising under ERISA of a character which if unpaid or unperformed might result in the imposition of a Lien against any of its properties or assets.

7.15. <u>Labor Relations</u>. Except as could not reasonably be expected to have a Material Adverse Effect, (i) there are no strikes, lockouts or other labor disputes against the Borrower or, to the best knowledge of the Borrower, threatened, (ii) hours worked by and payment made to employees of the Borrower have not been in violation of the Fair Labor Standards Act or any other applicable law, and (iii) no unfair labor practice complaint is pending against the Borrower or, to the best knowledge of the Borrower, threatened before any governmental authority.

7.16. <u>Security Interest</u>. This Agreement creates a valid security interest in favor of the Bank in the Collateral and, when properly perfected by filing in the appropriate jurisdictions, or by possession or Control of such Collateral by the Bank or delivery of such Collateral to the Bank, shall constitute a valid, perfected, first-priority security interest in such Collateral, except to the extent of Permitted Liens.

7.17.   Lending Relationship.  The relationship hereby created between the Borrower and the Bank is and has been conducted on an open and arm's length basis in which no fiduciary relationship exists, and the Borrower has not relied and is not relying on any such fiduciary relationship in executing this Agreement and in consummating the Loans.  The Bank represents that it will receive any Note payable to its order as evidence of a bank loan.

7.18.   Business Loan.   The Loans, including interest rate, fees and charges as contemplated hereby, (i) are business loans within the purview of 815 ILCS 205/4(1)(c), as amended from time to time, (ii) are an exempted transaction under the Truth In Lending Act, 12 U.S.C. 1601 et seq., as amended from time to time, and (iii) do not, and when disbursed shall not, violate the provisions of the Illinois usury laws, any consumer credit laws or the usury laws of any state which may have jurisdiction over this transaction, the Borrower or any property securing the Loans.

7.19.   Taxes.  The Borrower has timely filed all tax returns and reports required by law to have been filed by it and has paid all taxes, governmental charges and assessments due and payable with respect to such returns, except any such taxes or charges which are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books, are insured against or bonded over to the satisfaction of the Bank and the contesting of such payment does not create a Lien on the Collateral which is not a Permitted Lien.  There is no controversy or objection pending, or to the knowledge of the Borrower, threatened in respect of any tax returns of the Borrower.  The Borrower has made adequate reserves on its books and records in accordance with GAAP for all taxes that have accrued but which are not yet due and payable.

7.20.   Compliance with Regulation U.  No portion of the proceeds of the Loans shall be used by the Borrower, or any Affiliate of the Borrower, either directly or indirectly, for the purpose of purchasing or carrying any margin stock, within the meaning of Regulation U as adopted by the Board of Governors of the Federal Reserve System or any successor thereto.

7.21.   Governmental Regulation.  The Borrower and its Subsidiaries are not, or after giving effect to any loan, will not be, subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act, the ICC Termination Act of 1995 or the Investment Company Act of 1940 or to any federal or state statute or regulation limiting its ability to incur indebtedness for borrowed money.

7.22.   Bank Accounts.  Except for the Permitted Foreign Deposit Accounts, all Deposit Accounts and operating bank accounts of the Borrower and its Subsidiaries are located at the Bank.

7.23.   Place of Business.  The principal place of business and books and records of the Borrower is set forth in the preamble to this Agreement, and the location of all Collateral, if other than at such principal place of business, is as set forth on Schedule 7.23 attached hereto and made a part hereof, and the Borrower shall promptly notify the Bank of any change in such locations.  The Borrower will not remove or permit the Collateral to be removed from such locations without the prior written consent of the Bank, except for Inventory sold in the usual and ordinary course of the Borrower's business.

7.24.   Complete Information.  This Agreement and all financial statements, schedules, certificates, confirmations, agreements, contracts, and other materials and information heretofore or contemporaneously herewith furnished in writing by the Borrower to the Bank for purposes of, or in connection with, this Agreement and the transactions contemplated hereby is, and all written information hereafter furnished by or on behalf of the Borrower to the Bank pursuant hereto or in connection herewith will be, true and accurate in every material respect on the date as of which such information is dated or certified, and none of such information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading in light of the circumstances under which made (it being recognized by the Bank that any projections and forecasts provided by the Borrower are based on good faith estimates and assumptions believed by the Borrower to be reasonable as of the date of the applicable projections or assumptions and that actual results during the period or periods covered by any such projections and forecasts may differ from projected or forecasted results).

Section 8.   AFFIRMATIVE COVENANTS.

8.1.   Compliance with Bank Regulatory Requirements; Increased Costs.  If the Bank shall reasonably determine that any Regulatory Change, or compliance by the Bank or any Person controlling the Bank with any request or directive (whether or not having the force of law) of any governmental authority, central bank or comparable agency has or would have the effect of reducing the rate of return on the Bank's or such controlling Person's capital as a consequence of the Bank's obligations hereunder or under any Letter of Credit to a level below that which the Bank or such controlling Person could have achieved but for such Regulatory Change or compliance (taking into consideration the Bank's or such controlling Person's policies with respect to capital adequacy) by an amount deemed by the Bank or such controlling Person to be material or would otherwise reduce the amount of any sum received or receivable by the Bank under this Agreement or under any Note with respect thereto, then from time to time, upon demand by the Bank (which demand shall be accompanied by a statement setting forth the basis for such demand and a calculation of the amount thereof in reasonable detail), the Borrower shall pay directly to the Bank or such controlling Person such additional amount as will compensate the Bank for such increased cost or such reduction, so long as such amounts have accrued on or after the day which is one hundred eighty days (180) days prior to the date on which the Bank first made demand therefor.

8.2.   Borrower Existence.  The Borrower shall at all times (a) preserve and maintain its existence and good standing in the jurisdiction of its organization, (b) preserve and maintain its qualification to do business and good standing in each jurisdiction where the nature of its business makes such qualification necessary (other than such jurisdictions in which the failure to be qualified or in good standing could not reasonably be expected to have a Material Adverse Effect), and (c) continue as a going concern in the business which the Borrower is presently conducting.  If the Borrower does not have an Organizational Identification Number and later obtains one, the Borrower shall promptly notify the Bank of such Organizational Identification Number.

8.3.   Compliance With Laws.  The Borrower shall use the proceeds of the Loans not in contravention of any requirements of law and not in violation of this Agreement, and shall comply, and cause each Subsidiary to comply, in all respects, including the conduct of its

business and operations and the use of its properties and assets, with all applicable laws, rules, regulations, decrees, orders, judgments, licenses and permits, except where failure to comply could not reasonably be expected to have a Material Adverse Effect. In addition, and without limiting the foregoing sentence, the Borrower shall (a) ensure, and cause each Subsidiary to ensure, that no person who owns a controlling interest in or otherwise controls the Borrower or any Subsidiary is or shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, (b) not use or permit the use of the proceeds of the Loans to violate any of the foreign asset control regulations of OFAC or any enabling statute or Executive Order relating thereto, and (c) comply, and cause each Subsidiary to comply, with all applicable Bank Secrecy Act laws and regulations, as amended.

8.4.    Payment of Taxes and Liabilities. The Borrower shall pay, and cause each Subsidiary to pay, and discharge, prior to delinquency and before penalties accrue thereon, all property and other taxes, and all governmental charges or levies against it or any of the Collateral, as well as claims of any kind which, if unpaid, could become a Lien on any of its property; provided that the foregoing shall not require the Borrower or any Subsidiary to pay any such tax or charge so long as it shall contest the validity thereof in good faith by appropriate proceedings and shall set aside on its books adequate reserves with respect thereto in accordance with GAAP and, in the case of a claim which could become a Lien on any of the Collateral, such contest proceedings stay the foreclosure of such Lien or the sale of any portion of the Collateral to satisfy such claim.

8.5.    Maintain Property. The Borrower shall at all times maintain, preserve and keep its plant, properties and Equipment, including any Collateral, in good repair, working order and condition, normal wear and tear excepted, and shall from time to time make all needful and proper repairs, renewals, replacements, and additions thereto so that at all times the efficiency thereof shall be fully preserved and maintained. The Borrower shall permit the Bank to examine and inspect such plant, properties and Equipment, including any Collateral, at all reasonable times.

8.6.    Maintain Insurance. The Borrower shall at all times maintain, and cause each Subsidiary to maintain, with insurance companies reasonably acceptable to the Bank, such insurance coverage as may be required by any law or governmental regulation or court decree or order applicable to it and such other insurance, to such extent and against such hazards and liabilities, including employers', public and professional liability risks, as is customarily maintained by companies similarly situated, and shall have insured amounts no less than, and deductibles no higher than, are reasonably acceptable to the Bank. The Borrower shall furnish to the Bank a certificate setting forth in reasonable detail the nature and extent of all insurance maintained by the Borrower, which shall be reasonably acceptable in all respects to the Bank. The Borrower shall cause each issuer of an insurance policy to provide the Bank with an endorsement (i) showing the Bank as lender's loss payee with respect to each policy of property or casualty insurance; and (ii) providing that thirty (30) days' notice (ten (10) days' notice for non-payment of premiums) will be given to the Bank prior to any cancellation of, material reduction or change in coverage provided by or other material modification to such policy. The Borrower shall execute and deliver to the Bank a collateral assignment, in form and substance

satisfactory to the Bank, of each business interruption insurance policy maintained by the Borrower.

In the event the Borrower either fails to provide the Bank with evidence of the insurance coverage required by this Section or at any time hereafter shall fail to obtain or maintain any of the policies of insurance required above, or to pay any premium in whole or in part relating thereto, then the Bank, without waiving or releasing any obligation or default by the Borrower hereunder, may at any time (but shall be under no obligation to so act), obtain and maintain such policies of insurance and pay such premiums and take any other action with respect thereto, which the Bank deems advisable. This insurance coverage (a) may, but need not, protect the Borrower's interests in such property, including the Collateral, and (b) may not pay any claim made by, or against, the Borrower in connection with such property, including the Collateral. The Borrower may later cancel any such insurance purchased by the Bank, but only after providing the Bank with evidence that the Borrower has obtained the insurance coverage required by this Section. If the Bank purchases insurance for the Collateral, the Borrower will be responsible for the costs of that insurance, including interest and any other charges that may be imposed with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the principal amount of the Loans owing hereunder. The costs of the insurance may be more than the cost of the insurance the Borrower may be able to obtain on its own.

8.7. <u>ERISA Liabilities; Employee Plans</u>. The Borrower shall (i) keep in full force and effect any and all Employee Plans which are presently in existence or may, from time to time, come into existence under ERISA, and not withdraw from any such Employee Plans, unless such withdrawal can be effected or such Employee Plans can be terminated without material liability to the Borrower; (ii) make contributions to all of such Employee Plans in a timely manner and in a sufficient amount to comply with the standards of ERISA; including the minimum funding standards of ERISA; (iii) comply with all material requirements of ERISA which relate to such Employee Plans; (iv) notify the Bank immediately upon receipt by the Borrower of any notice concerning the imposition of any withdrawal liability or of the institution of any proceeding or other action which may result in the termination of any such Employee Plans or the appointment of a trustee to administer such Employee Plans; (v) promptly advise the Bank of the occurrence of any "Reportable Event" or "Prohibited Transaction" (as such terms are defined in ERISA), with respect to any such Employee Plans; and (vi) amend any Employee Plan that is intended to be qualified within the meaning of Section 401 of the Internal Revenue Code of 1986 to the extent necessary to keep the Employee Plan qualified, and to cause the Employee Plan to be administered and operated in a manner that does not cause the Employee Plan to lose its qualified status.

8.8. <u>Financial Statements</u>. The Borrower shall at all times maintain a standard and modern system of accounting, on the accrual basis of accounting and in all respects in accordance with GAAP, and shall furnish to the Bank or its authorized representatives such information regarding the business affairs, operations and financial condition of the Borrower, including:

(a)    promptly when available, and in any event, within one hundred twenty (120) days after the close of each of its fiscal years, a copy of (i) the annual audited

financial statements of the Borrower, its general partners and Subsidiaries, including consolidated balance sheet, statement of income and retained earnings, statement of cash flows for the fiscal year then ended and such other information (including nonfinancial information) as the Bank may reasonably request, in reasonable detail, prepared and certified without adverse reference to going concern value and without qualification by an independent auditor of recognized standing, selected by the Borrower and reasonably acceptable to the Bank and (ii) a consolidating balance sheet of the Borrower, its general partners and Subsidiaries as of the end of each of its fiscal years and consolidating statements of earnings and cash flows for the Borrower, its general partners and Subsidiaries for each of its fiscal years, certified as true and correct by the Borrower's treasurer or chief financial officer; and

(b)    promptly when available, and in any event, within forty five (45) days following the end of each fiscal quarter, a copy of the consolidated and consolidating financial statements of Borrower, its general partners and Subsidiaries regarding such fiscal quarter, including balance sheet, statement of income and retained earnings, statement of cash flows for the fiscal quarter then ended and such other information (including nonfinancial information) as the Bank may request, in reasonable detail, prepared and certified as true and correct by the Borrower's treasurer or chief financial officer; and

(c)    promptly when available, and in any event, within one hundred fifty (150) days after the close of each of its fiscal years (as such date may be extended in accordance with properly granted extensions), a signed copy of the complete income tax returns filed with the Internal Revenue Service by the Borrower and Tinsel.

No change with respect to such accounting principles shall be made by the Borrower without giving prior notification to the Bank. The Borrower represents and warrants to the Bank that the financial statements delivered to the Bank at or prior to the execution and delivery of this Agreement and to be delivered at all times thereafter accurately reflect in all material respects and will accurately reflect in all material respects the financial condition of the Borrower. The Bank shall have the right at all times during business hours to inspect the books and records of the Borrower and make extracts therefrom.

8.9.    <u>Supplemental Financial Statements</u>.    The Borrower shall immediately upon receipt thereof, provide to the Bank copies of interim and supplemental reports if any, submitted to the Borrower by independent accountants in connection with any interim audit or review of the books of the Borrower.

8.10.    <u>Covenant Compliance Certificate</u>.    The Borrower shall, contemporaneously with the furnishing of the financial statements pursuant to <u>Section 8.8(a)</u> and <u>Section 8.8(b)</u>, deliver to the Bank a duly completed compliance certificate (a "Compliance Certificate"), dated the date of such financial statements and certified as true and correct by an appropriate officer of the Borrower, containing a computation of each of the financial covenants set forth in <u>Section 10</u> and stating that the Borrower has not become aware of any Event of Default or Unmatured Event of Default that has occurred and is continuing or, if there is any such Event of Default or Unmatured Event of Default describing it and the steps, if any, being taken to cure it.

8.11.   Field Audits.  The Borrower shall permit the Bank to inspect the Inventory, other tangible assets and/or other business operations of the Borrower and each Subsidiary, to perform appraisals of the Equipment of the Borrower and each Subsidiary, and to inspect, audit, check and make copies of, and extracts from, the books, records, computer data, computer programs, journals, orders, receipts, correspondence and other data relating to Inventory, Accounts and any other Collateral, the results of which must be satisfactory to the Bank in the Bank's sole and absolute discretion.  All such inspections or audits by the Bank shall be at the Borrower's sole expense, provided, however, that so long as no Event of Default or Unmatured Event of Default exists, (a) the Borrower shall not be required to reimburse the Bank for inspections or audits, and (b) the Bank shall not request more than one audit in each fiscal year.

8.12.   Other Reports.  The Borrower shall, within such period of time as the Bank may specify, deliver to the Bank such other schedules and reports as the Bank may require.

8.13.   Collateral Records.  The Borrower shall keep full and accurate books and records relating to the Collateral and shall mark such books and records to indicate the Bank's Lien in the Collateral, including placing a legend, in form and content acceptable to the Bank, on all material Chattel Paper created by the Borrower indicating that the Bank has a Lien in such Chattel Paper.

8.14.   Intellectual Property.   The Borrower shall maintain, preserve and renew all Intellectual Property necessary for the conduct of its business as and where the same is currently located as heretofore or as hereafter conducted by it.

8.15.   Notice of Proceedings.  The Borrower, promptly upon becoming aware, shall give written notice to the Bank of any litigation, arbitration or governmental investigation or proceeding not previously disclosed by the Borrower to the Bank which has been instituted or, to the knowledge of the Borrower, is threatened against the Borrower or any of its Subsidiaries or to which any of their respective properties is subject which might reasonably be expected to have a Material Adverse Effect.

8.16.   Notice of Event of Default or Material Adverse Effect.   The Borrower shall, immediately after the commencement thereof, give notice to the Bank in writing of the occurrence of any Event of Default or any Unmatured Event of Default, or the occurrence of any condition or event having a Material Adverse Effect.

8.17.   Environmental Matters.  If any release or threatened release or other disposal of Hazardous Substances shall occur or shall have occurred on any real property or any other assets of the Borrower or any of its Subsidiaries, the Borrower shall, or shall cause the applicable Subsidiary to, cause the prompt containment and removal of such Hazardous Substances and the remediation of such real property or other assets as necessary to comply in all material respects with all Environmental Laws and to preserve the value of such real property or other assets. Without limiting the generality of the foregoing, the Borrower shall, and shall cause each Subsidiary to, comply with any Federal or state judicial or administrative order requiring the performance at any real property of the Borrower or any Subsidiary of activities in response to the release or threatened release of a Hazardous Substance.  To the extent that the transportation of Hazardous Substances is permitted by this Agreement, the Borrower shall, and shall cause its

Subsidiaries to, dispose of such Hazardous Substances, or of any other wastes, only at licensed disposal facilities operating in compliance with Environmental Laws.

8.18. <u>Further Assurances</u>. The Borrower shall take, and cause each Subsidiary to take, such actions as are necessary or as the Bank may reasonably request from time to time to ensure that the Obligations under the Loan Documents are secured by substantially all of the assets of the Borrower and its Subsidiaries, in each case as the Bank may determine, including (a) the execution and delivery of security agreements, pledge agreements, mortgages, deeds of trust, financing statements and other documents, and the filing or recording of any of the foregoing, and (b) the delivery of certificated securities and other Collateral with respect to which perfection is obtained by possession.

8.19. <u>Banking Relationship</u>. The Borrower covenants and agrees, at all times during the term of this Agreement, to utilize the Bank as its primary bank of account and depository for all financial services, including all receipts, disbursements, cash management and related service.

Section 9. <u>NEGATIVE COVENANTS</u>.

9.1. <u>Debt</u>. The Borrower shall not, either directly or indirectly, create, assume, incur or have outstanding any Debt (including purchase money indebtedness), or become liable, whether as endorser, guarantor, surety or otherwise, for any debt or obligation of any other Person, except:

        (a)     the Obligations under this Agreement and the other Loan Documents;

        (b)     obligations of the Borrower for Taxes, assessments, municipal or other governmental charges;

        (c)     obligations of the Borrower for accounts payable, other than for money borrowed, and existing leases of real property, all incurred in the ordinary course of business;

        (d)     Debt of the Borrower to any domestic Wholly-Owned Subsidiary or Debt of any domestic Wholly-Owned Subsidiary to the Borrower or another domestic Wholly-Owned Subsidiary; provided that such Debt shall be evidenced by a note in form and substance reasonably satisfactory to the Bank, and the obligations under such note shall be Subordinated Debt;

        (e)     Debt of the Borrower to any of its partners, any Affiliate of any of its partners and/or any Affiliate of any such Affiliate of any of its partners, whether such debt is Subordinated Debt or unsubordinated Debt;

        (f)     Subordinated Debt;

        (g)     Hedging Obligations incurred in favor of the Bank or an Affiliate thereof for bona fide hedging purposes and not for speculation;

(h)     Capitalized Lease Obligations, provided that the aggregate amount of all such Debt outstanding at any time shall not exceed Seven Hundred Fifty Thousand and 00/100 Dollars ($750,000.00) in the aggregate;

(i)     Debt for Capital Expenditures incurred after the date of this Agreement not to exceed Seven Hundred Fifty Thousand and 00/100 Dollars ($750,000.00) in the aggregate;

(j)     Debt described on <u>Schedule 9.1</u> and any extension, renewal or refinancing thereof so long as the principal amount thereof is not increased; and

(k)     other unsecured Debt, in addition to the Debt listed above, in an aggregate amount outstanding at any time not to exceed One Hundred Thousand and 00/100 Dollars ($100,000.00).

9.2.     <u>Encumbrances</u>.   The Borrower shall not, either directly or indirectly, create, assume, incur or suffer or permit to exist any Lien or charge of any kind or character upon any asset of the Borrower, whether owned at the date hereof or hereafter acquired, except for Permitted Liens.

9.3.     <u>Investments</u>.   The Borrower shall not, either directly or indirectly, make or have outstanding any Investment, except:

(a)     contributions by the Borrower to the capital of any Wholly-Owned Subsidiary which has granted a first perfected security interest in all of its assets in favor of the Bank, or by any Subsidiary to the capital of any other domestic Wholly-Owned Subsidiary;

(b)     Investments constituting Debt permitted by <u>Section 9.1</u>;

(c)     Contingent Liabilities constituting Debt permitted by <u>Section 9.1</u> or Liens permitted by <u>Section 9.2</u>;

(d)     Cash Equivalent Investments;

(e)     bank deposits in the ordinary course of business, provided that the aggregate amount of all such deposits (excluding amounts in payroll accounts or for accounts payable, in each case to the .extent that checks have been issued to third parties) which are maintained with any bank other than the Bank shall not at any time exceed One Thousand and 00/100 Dollars ($1,000.00) and, provided further, that this limitation shall not apply to the amount of any deposit maintained in the Permitted Foreign Deposit Accounts.

(f)     Investments in securities of Account Debtors received pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of such account debtors; and

(g)     Investments listed on <u>Schedule 9.3</u> as of the Closing Date.

provided, however, that (i) any Investment which when made complies with the requirements of the definition of the term "Cash Equivalent Investment" may continue to be held notwithstanding that such Investment if made thereafter would not comply with such requirements; and (ii) no Investment otherwise permitted by subsections (b) or (c) shall be permitted to be made if, immediately before or after giving effect thereto, any Event of Default or Unmatured Event of Default exists.

9.4.     Transfer; Merger; Sales.  The Borrower shall not and not permit any Subsidiary to, whether in one transaction or a series of related transactions, (a) be a party to any merger or consolidation, or purchase or otherwise acquire all or substantially all of the assets or any Capital Securities of any class of, or any partnership or joint venture interest in, any other Person, except for (i) any such merger, consolidation, sale, transfer, conveyance, lease or assignment of or by any Wholly-Owned Subsidiary into the Borrower or into any other domestic Wholly-Owned Subsidiary; (ii) any such purchase or other acquisition by the Borrower or any domestic Wholly-Owned Subsidiary of the assets or equity interests of any Wholly-Owned Subsidiary, (b) sell, transfer, convey or lease all or any substantial part of its assets or Capital Securities (including the sale of Capital Securities of any Subsidiary), except for sales of Inventory in the ordinary course of business, or (c) sell or assign, with or without recourse, any receivables.

9.5.     Issuance of Capital Securities.  The Borrower shall not and shall not permit any Subsidiary to issue any Capital Securities other than any issuance of shares of the Borrower's common Capital Securities pursuant to any employee or director option program, benefit plan or compensation program.

9.6.     Transactions with Affiliates.  The Borrower shall not, directly or indirectly, enter into or permit to exist any transaction with any of its Affiliates or with any director, officer or employee of the Borrower other than transactions in the ordinary course of, and pursuant to the reasonable requirements of, the business of the Borrower and upon fair and reasonable terms which are fully disclosed to the Bank and are no less favorable to the Borrower than would be obtained in a comparable arm's length transaction with a Person that is not an Affiliate of the Borrower.

9.7.     Unconditional Purchase Obligations.  The Borrower shall not and shall not permit any Subsidiary to enter into or be a party to any contract for the purchase of materials, supplies or other property or services if such contract requires that payment be made by it regardless of whether delivery is ever made of such materials, supplies or other property or services.

9.8.     Cancellation of Debt.  The Borrower shall not, and not permit any Subsidiary to, cancel any claim or debt owing to it, except for reasonable consideration or in the ordinary course of business.

9.9.     Inconsistent Agreements.  The Borrower shall not and shall not permit any Subsidiary to enter into any agreement containing any provision which would (a) be violated or breached by any borrowing by the Borrower hereunder or by the performance by the Borrower or any Subsidiary of any of its Obligations hereunder or under any other Loan Document, (b) prohibit the Borrower or any Subsidiary from granting to the Bank a Lien on any of its assets or (c) create or permit to exist or become effective any encumbrance or restriction on the ability

of any Subsidiary to (i) pay dividends or make other distributions to the Borrower or any other Subsidiary, or pay any Debt owed to the Borrower or any other Subsidiary, (ii) make loans or advances to the Borrower or any other Subsidiary, or (iii) transfer any of its assets or properties to the Borrower or any other Subsidiary, other than (A) customary restrictions and conditions contained in agreements relating to the sale of all or a substantial part of the assets of any Subsidiary pending such sale, provided that such restrictions and conditions apply only to the Subsidiary to be sold and such sale is permitted hereunder, (B) restrictions or conditions imposed by any agreement relating to purchase money Debt, Capital Leases and other secured Debt permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Debt, and (C) customary provisions in leases and other contracts restricting the assignment thereof.

9.10.   Use of Proceeds.   Neither the Borrower nor any of its Subsidiaries or Affiliates shall use any portion of the proceeds of the Loans, either directly or indirectly, for the purpose of purchasing any securities underwritten by any Affiliate of the Bank.

9.11.   Bank Accounts.   Except for Permitted Foreign Deposit Accounts, the Borrower shall not establish any new Deposit Accounts or other bank accounts, other than Deposit Accounts or other bank accounts established at or with the Bank, without the prior written consent of the Bank.

9.12.   Business Activities: Change of Legal Status and Organizational Documents.   The Borrower shall not and shall not permit any Subsidiary to (a) engage in any line of business other than the businesses engaged in on the date hereof and businesses reasonably related thereto, (b) change its name, its Organizational Identification Number, if it has one, its type of organization, its jurisdiction of organization or other legal structure, or (c) permit its charter, bylaws or other organizational documents to be amended or modified in any way which could reasonably be expected to materially adversely affect the interests of the Bank.

Section 10.   FINANCIAL COVENANTS.

10.1.   Tangible Net Worth.   As of the end of each of its fiscal years commencing with the fiscal year ended December 31, 2015, the Borrower and its Subsidiaries shall maintain consolidated Tangible Net Worth in an amount not less than Four Million and no/100 Dollars ($4,000,000.00).

10.2.   Senior Debt to EBITDA.   The Borrower shall not permit the ratio of Senior Debt to EBITDA, tested as of the last day of each fiscal quarter, to be greater than the following ratios on each measurement date of each fiscal quarter set forth below, as determined on a trailing twelve month basis:

| Annual Date | Amount |
|---|---|
| March 31 | 3.50:1.00 |
| June 30 | 4.50:1.00 |
| September 30 | 6.00:1.00 |
| December 31 | 3.50:1.00 |

Section 11. <u>EVENTS OF DEFAULT</u>. The Borrower, without notice or demand of any kind, shall be in default under this Agreement upon the occurrence of any of the following events (each an "Event of Default").

11.1. <u>Nonpayment of Obligations</u>. Any amount due and owing on any Note or any of the Obligations, whether by its terms or as otherwise provided herein, is not paid within ten (10) days after notice from the Bank that such amount was not paid when due.

11.2. <u>Misrepresentation</u>. Any written warranty, representation, certificate or statement of any Obligor in this Agreement, the other Loan Documents or any other agreement with the Bank shall be false in any material respect when made or at any time thereafter, or if any financial data or any other information now or hereafter furnished to the Bank by or on behalf of any Obligor shall prove to be false, inaccurate or misleading in any material respect.

11.3. <u>Nonperformance</u>. Any failure to perform or default in the performance of any covenant, condition or agreement contained in this Agreement and, if capable of being cured, such failure to perform or default in performance continues for a period of thirty (30) days after the Borrower receives notice or knowledge from any source of such failure to perform or default in performance, or in the other Loan Documents or any other agreement with the Bank and such failure to perform or default in performance continues beyond any applicable grace or cure period.

11.4. <u>Default under Loan Documents</u>. A default under any of the other Loan Documents, all of which covenants, conditions and agreements contained therein are hereby incorporated in this Agreement by express reference, shall be and constitute an Event of Default under this Agreement and any other of the Obligations.

11.5. <u>Default under Other Debt</u>. Any default by any Obligor in the payment of any Debt for any other obligation beyond any period of grace provided with respect thereto or in the performance of any other term, condition or covenant contained in any agreement (including any capital or operating lease or any agreement in connection with the deferred purchase price of property) under which any such obligation is created, the effect of which default is to cause or permit the holder of such obligation (or the other party to such other agreement) to cause such obligation to become due prior to its stated maturity or terminate such other agreement.

11.6. <u>Other Material Obligations</u>. Any default in the payment when due, or in the performance or observance of, any material obligation of, or condition agreed to by, any Obligor with respect to any material purchase or lease of goods or services where such default, singly or in the aggregate with all other such defaults, might reasonably be expected to have a Material Adverse Effect.

11.7. <u>Bankruptcy, Insolvency, etc</u>. Any Obligor becomes insolvent or generally fails to pay, or admits in writing its inability or refusal to pay, debts as they become due; or any Obligor applies for, consents to, or acquiesces in the appointment of a trustee, receiver or other custodian for such Obligor or any property thereof, or makes a general assignment for the benefit of creditors; or, in the absence of such application, consent or acquiescence, a trustee, receiver or

41

other custodian is appointed for any Obligor or for a substantial part of the property of any thereof and is not discharged within sixty (60) days; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceeding, is commenced in respect of any Obligor, and if such case or proceeding is not commenced by such Obligor, it is consented to or acquiesced in by such Obligor, or remains undismissed for sixty (60) days; or any Obligor takes any action to authorize, or in furtherance of, any of the foregoing.

11.8.   <u>Judgments</u>.   The entry of any final judgment, decree, levy, attachment, garnishment or other process or the filing of any Lien against any Obligor which is not fully covered by insurance, and such judgment or other process shall not have been, within thirty (30) days from the entry thereof, (i) bonded over to the reasonable satisfaction of the Bank and appealed, (ii) vacated, or (iii) discharged.

11.9.   <u>Change in Control</u>.  The occurrence of any Change in Control.

11.10. <u>Collateral Impairment</u>.   The entry of any judgment, decree, levy, attachment, garnishment or other process, or the filing of any Lien against, any of the Collateral or any collateral under a separate security agreement securing any of the Obligations and such judgment or other process shall not have been, within thirty (30) days from the entry thereof, (i) bonded over to the satisfaction of the Bank and appealed, (ii) vacated, or (iii) discharged, or the loss, theft, destruction, seizure or forfeiture, or the occurrence of any material deterioration or impairment of any of the Collateral or any of the collateral under any security agreement securing any of the Obligations, or any material decline or depreciation in the value or market price thereof (whether actual or reasonably anticipated), which causes the Collateral, in the sole opinion of the Bank acting in good faith, to become unsatisfactory as to value or character, or which causes the Bank to reasonably believe that it is insecure and that the likelihood for repayment of the Obligations is or will soon be impaired, time being of the essence.  The cause of such deterioration, impairment, decline or depreciation shall include, but is not limited to, the failure by the Borrower to do any act deemed necessary by the Bank to preserve and maintain the value and collectability of the Collateral.

11.11. <u>Material Adverse Effect</u>.  The occurrence of any development, condition or event which has a Material Adverse Effect on the Borrower.

11.12. <u>Subordinated Debt</u>.  The subordination provisions of any Subordinated Debt shall for any reason be revoked or invalid or otherwise cease to be in full force and effect.  The Borrower shall contest in any manner, or any other holder thereof shall contest in any judicial proceeding, the validity or enforceability of the Subordinated Debt or deny that it has any further liability or obligation thereunder, or the Obligations shall for any reason not have the priority contemplated by the subordination provisions of the Subordinated Debt.

11.13. <u>Cross Default</u>.  A breach, default or event of default under the Tinsel Loan Agreement shall be deemed an Event of Default under this Agreement and the other Loan Documents, and an Event of Default under this Agreement shall be deemed a default under the Tinsel Loan Agreement.

Section 12.    REMEDIES.

Upon the occurrence and continuance of an Event of Default, the Bank shall have all rights, powers and remedies set forth in the Loan Documents, in any written agreement or instrument (other than this Agreement or the Loan Documents) relating to any of the Obligations or any security therefor, as a secured party under the UCC or as otherwise provided at law or in equity. Without limiting the generality of the foregoing, the Bank may, at its option upon the occurrence of an Event of Default, declare its commitments to the Borrower to be terminated and all Obligations to be immediately due and payable, provided, however, that upon the occurrence of an Event of Default under Section 11.7, all commitments of the Bank to the Borrower shall immediately terminate and all Obligations shall be automatically due and payable, all without demand, notice or further action of any kind required on the part of the Bank. The Borrower hereby waives any and all presentment, demand, notice of dishonor, protest, and all other notices and demands in connection with the enforcement of Bank's rights under the Loan Documents, and hereby consents to, and waives notice of release, with or without consideration, of the Borrower or of any Collateral, notwithstanding anything contained herein or in the Loan Documents to the contrary. In addition to the foregoing:

12.1.    Possession and Assembly of Collateral. The Bank may, without notice, demand or legal process of any kind, take possession of any or all of the Collateral (in addition to Collateral of which the Bank already has possession), wherever it may be found, and for that purpose may pursue the same wherever it may be found, and may at any time enter into any of the Borrower's premises where any of the Collateral may be or is supposed to be, and search for, take possession of, remove, keep and store any of the Collateral until the same shall be sold or otherwise disposed of and the Bank shall have the right to store and conduct a sale of the same in any of the Borrower's premises without cost to the Bank. At the Bank's request, the Borrower will, at the Borrower's sole expense, assemble the Collateral and make it available to the Bank at a place or places to be designated by the Bank which is reasonably convenient to the Bank and the Borrower.

12.2.    Sale of Collateral. The Bank may sell any or all of the Collateral at public or private sale, upon such terms and conditions as the Bank may deem proper, and the Bank may purchase any or all of the Collateral at any such sale. The Borrower acknowledges that the Bank may be unable to effect a public sale of all or any portion of the Collateral because of certain legal and/or practical restrictions and provisions which may be applicable to the Collateral and, therefore, may be compelled to resort to one or more private sales to a restricted group of offerees and purchasers. The Borrower consents to any such private sale so made even though at places and upon terms less favorable than if the Collateral were sold at public sale. The Bank shall have no obligation to clean-up or otherwise prepare the Collateral for sale. The Bank may apply the Proceeds, after deducting all costs, expenses, attorneys' and paralegals' fees incurred or paid at any time in the collection, protection and sale of the Collateral and the Obligations, to the payment of any Note and/or any of the other Obligations, returning the excess Proceeds, if any, to the Borrower. The Borrower shall remain liable for any amount remaining unpaid after such application, with interest at the Default Rate. Any notification of intended disposition of the Collateral required by law shall be conclusively deemed reasonably and properly given if given by the Bank at least ten (10) calendar days before the date of such disposition. The Borrower hereby confirms, approves and ratifies all acts and deeds of the Bank relating to the

43

foregoing, and each part thereof, and expressly waives any and all claims of any nature, kind or description which it has or may hereafter have against the Bank or its representatives, by reason of taking, selling or collecting any portion of the Collateral. The Borrower consents to releases of the Collateral at any time (including prior to default) and to sales of the Collateral in groups, parcels or portions, or as an entirety, as the Bank shall deem appropriate. The Borrower expressly absolves the Bank from any loss or decline in market value of any Collateral by reason of delay in the enforcement or assertion or nonenforcement of any rights or remedies under this Agreement.

12.3.    <u>Standards for Exercising Remedies</u>.  To the extent that applicable law imposes duties on the Bank to exercise remedies in a commercially reasonable manner, the Borrower acknowledges and agrees that it is not commercially unreasonable for the Bank (a) to fail to incur expenses reasonably deemed significant by the Bank to prepare Collateral for disposition or otherwise to complete raw material or work-in-process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against Account Debtors or other Persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against Account Debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other Persons, whether or not in the same business as the Borrower, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (h) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, including any warranties of title, (k) to purchase insurance or credit enhancements to insure the Bank against risks of loss, collection or disposition of Collateral or to provide to the Bank a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by the Bank, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Bank in the collection or disposition of any of the Collateral. The Borrower acknowledges that the purpose of this section is to provide non-exhaustive indications of what actions or omissions by the Bank would not be commercially unreasonable in the Bank's exercise of remedies against the Collateral and that other actions or omissions by the Bank shall not be deemed commercially unreasonable solely on account of not being indicated in this section. Without limitation upon the foregoing, nothing contained in this section shall be construed to grant any rights to the Borrower or to impose any duties on the Bank that would not have been granted or imposed by this Agreement or by applicable law in the absence of this section.

12.4.    <u>UCC and Offset Rights</u>.  The Bank may exercise, from time to time, any and all rights and remedies available to it under the UCC or under any other applicable law in addition to, and not in lieu of, any rights and remedies expressly granted in this Agreement or in any other agreements between any Obligor and the Bank, and may, without demand or notice of any kind,

appropriate and apply toward the payment of such of the Obligations, whether matured or unmatured, including costs of collection and attorneys' and paralegals' fees, and in such order of application as the Bank may, from time to time, elect, any indebtedness of the Bank to any Obligor, however created or arising, including balances, credits, deposits, accounts or moneys of such Obligor in the possession, control or custody of, or in transit to the Bank. The Borrower, on behalf of itself and each Obligor, hereby waives the benefit of any law that would otherwise restrict or limit the Bank in the exercise of its right, which is hereby acknowledged, to appropriate at any time hereafter any such indebtedness owing from the Bank to any Obligor.

12.5. <u>Additional Remedies</u>. The Bank shall have the right and power to:

(a)     instruct the Borrower, at its own expense, to notify any parties obligated on any of the Collateral, including any Account Debtors, to make payment directly to the Bank of any amounts due or to become due thereunder, or the Bank may directly notify such obligors of the security interest of the Bank, and/or of the assignment to the Bank of the Collateral and direct such obligors to make payment to the Bank of any amounts due or to become due with respect thereto, and thereafter, collect any such amounts due on the Collateral directly from such Persons obligated thereon;

(b)     enforce collection of any of the Collateral, including any Accounts, by suit or otherwise, or make any compromise or settlement with respect to any of the Collateral, or surrender, release or exchange all or any part thereof, or compromise, extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder;

(c)     take possession or control of any Proceeds and products of any of the Collateral, including the proceeds of insurance thereon;

(d)     extend, renew or modify for one or more periods (whether or not longer than the original period) any Note, any other of the Obligations, any obligation of any nature of any other obligor with respect to any Note or any of the Obligations;

(e)     grant releases, compromises or indulgences with respect to any Note, any of the Obligations, any extension or renewal of any of the Obligations, any security therefor, or to any other obligor with respect to any Note or any of the Obligations;

(f)     transfer the whole or any part of securities which may constitute Collateral into the name of the Bank or the Bank's nominee without disclosing, if the Bank so desires, that such securities so transferred are subject to the security interest of the Bank, and any corporation, association, or any of the managers or trustees of any trust issuing any of such securities, or any transfer agent, shall not be bound to inquire, in the event that the Bank or such nominee makes any further transfer of such securities, or any portion thereof, as to whether the Bank or such nominee has the right to make such further transfer, and shall not be liable for transferring the same;

(g)     vote the Collateral;

(h)    make an election with respect to the Collateral under Section 1111 of the Bankruptcy Code or take action under Section 364 or any other section of the Bankruptcy Code; provided, however, that any such action of the Bank as set forth herein shall not, in any manner whatsoever, impair or affect the liability of the Borrower hereunder, nor prejudice, waive, nor be construed to impair, affect, prejudice or waive the Bank's rights and remedies at law, in equity or by statute, nor release, discharge, nor be construed to release or discharge, the Borrower, any guarantor or other Person liable to the Bank for the Obligations; and

(i)    at any time, and from time to time, accept additions to, releases, reductions, exchanges or substitution of the Collateral, without in any way altering, impairing, diminishing or affecting the provisions of this Agreement, the Loan Documents, or any of the other Obligations, or the Bank's rights hereunder, under any Note or under any of the other Obligations.

The Borrower hereby ratifies and confirms whatever the Bank may do with respect to the Collateral and agrees that the Bank shall not be liable for any error of judgment or mistakes of fact or law with respect to actions taken in connection with the Collateral.

12.6.   <u>Attorney-in-Fact</u>.  The Borrower hereby irrevocably makes, constitutes and appoints the Bank (and any officer of the Bank or any Person designated by the Bank for that purpose) as the Borrower's true and lawful proxy and attorney-in-fact (and agent-in-fact) in the Borrower's name, place and stead, with full power of substitution, to (i) take such actions as are permitted in this Agreement, (ii) execute such financing statements and other documents and to do such other acts as the Bank may require to perfect and preserve the Bank's security interest in, and to enforce such interests in the Collateral, and (iii) carry out any remedy provided for in this Agreement, including endorsing the Borrower's name to checks, drafts, instruments and other items of payment, and Proceeds of the Collateral, executing change of address forms with the postmaster of the United States Post Office serving the address of the Borrower, changing the address of the Borrower to that of the Bank, opening all envelopes addressed to the Borrower and applying any payments contained therein to the Obligations.  The Borrower hereby acknowledges that the constitution and appointment of such proxy and attorney-in-fact are coupled with an interest and are irrevocable. The Borrower hereby ratifies and confirms all that such attorney-in-fact may do or cause to be done by virtue of any provision of this Agreement.

12.7.   <u>No Marshaling</u>. The Bank shall not be required to marshal any present or future collateral security (including this Agreement and the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order.  To the extent that it lawfully may, the Borrower hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of the Bank's rights under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, the Borrower hereby irrevocably waives the benefits of all such laws.

12.8.   <u>Application of Proceeds</u>.  The Bank will, upon receipt of cash or solvent credits from collection of items of payment, Proceeds of Collateral or any other source, apply the whole or any part thereof against the Obligations secured hereby.  The Bank shall further have the exclusive right to determine how, when and what application of such payments and such credits shall be made on the Obligations, and such determination shall be conclusive upon the Borrower.  Any Proceeds of any disposition by the Bank of all or any part of the Collateral may be first applied by the Bank to the payment of expenses incurred by the Bank in connection with the Collateral, including attorneys' fees and legal expenses as provided for in <u>Section 13</u> hereof.

12.9.   <u>No Waiver</u>.  No Event of Default shall be waived by the Bank except in writing.  No failure or delay on the part of the Bank in exercising any right, power or remedy hereunder shall operate as a waiver of the exercise of the same or any other right at any other time; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.  There shall be no obligation on the part of the Bank to exercise any remedy available to the Bank in any order.  The remedies provided for herein are cumulative and not exclusive of any remedies provided at law or in equity.  The Borrower agrees that in the event that the Borrower fails to perform, observe or discharge any of its Obligations or liabilities under this Agreement or any other agreements with the Bank, no remedy of law will provide adequate relief to the Bank, and further agrees that the Bank shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

12.10.  <u>Letters of Credit</u>.  With respect to all Letters of Credit for which presentment for honor shall not have occurred at the time of either (a) the Revolving Loan Maturity Date or (b) an acceleration pursuant to this <u>Section 12</u>, the Borrower shall at such time deposit in a cash collateral account opened by the Bank an amount equal to one hundred percent (100.0%) of the Letter of Credit Obligations then outstanding.  Amounts held in such cash collateral account shall be applied by the Bank to the payment of drafts drawn under such Letters of Credit, and the unused portion thereof after all such Letters of Credit shall have expired or been fully drawn upon, if any, shall be applied to repay the Obligations, in such order of application as the Bank may, in its sole discretion, from time to time elect.  After all such Letters of Credit shall have expired or been fully drawn upon, all commitments to make Loans hereunder have terminated and all other Obligations have been indefeasibly satisfied and paid in full in cash, the balance, if any, in such cash collateral account shall be returned to the Borrower or such other Person as may be lawfully entitled thereto.

Section 13.   <u>MISCELLANEOUS</u>.

13.1.   <u>Obligations Absolute</u>.  None of the following shall affect the Obligations of the Borrower to the Bank under this Agreement or the Bank's rights with respect to the Collateral:

(a)   acceptance or retention by the Bank of other property or any interest in property as security for the Obligations;

(b)   release by the Bank of the Borrower or of all or any part of the Collateral or of any party liable with respect to the Obligations;

47

(c) release, extension, renewal, modification or substitution by the Bank of any Note, or any note evidencing any of the Obligations, or the compromise of the liability of the Obligations; or

(d) failure of the Bank to resort to any other security or to pursue the Borrower or any other obligor liable for any of the Obligations before resorting to remedies against the Collateral.

13.2. <u>Entire Agreement</u>. This Agreement and the other Loan Documents (i) are valid, binding and enforceable against the Borrower and the Bank in accordance with their respective provisions and no conditions exist as to their legal effectiveness; (ii) constitute the entire agreement between the parties with respect to the subject matter hereof and thereof; and (iii) are the final expression of the intentions of the Borrower and the Bank. No promises, either expressed or implied, exist between the Borrower and the Bank, unless contained herein or therein. This Agreement, together with the other Loan Documents, supersedes all negotiations, representations, warranties, commitments, term sheets, discussions, negotiations, offers or contracts (of any kind or nature, whether oral or written) prior to or contemporaneous with the execution hereof with respect to any matter, directly or indirectly related to the terms of this Agreement and the other Loan Documents. This Agreement and the other Loan Documents are the result of negotiations among the Bank, the Borrower and the other parties thereto, and have been reviewed (or have had the opportunity to be reviewed) by counsel to all such parties, and are the products of all parties. Accordingly, this Agreement and the other Loan Documents shall not be construed more strictly against the Bank merely because of the Bank's involvement in their preparation.

13.3. <u>Amendments; Waivers</u>. No delay on the part of the Bank in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by the Bank of any right, power or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy. No amendment, modification or waiver of, or consent with respect to, any provision of this Agreement or the other Loan Documents shall in any event be effective unless the same shall be in writing and acknowledged by the Bank, and then any such amendment, modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

13.4. <u>WAIVER OF DEFENSES</u>. THE BORROWER WAIVES EVERY PRESENT AND FUTURE DEFENSE, CAUSE OF ACTION, COUNTERCLAIM OR SETOFF WHICH THE BORROWER MAY NOW HAVE OR HEREAFTER MAY HAVE TO ANY ACTION BY THE BANK IN ENFORCING THIS AGREEMENT. PROVIDED THE BANK ACTS IN GOOD FAITH, THE BORROWER RATIFIES AND CONFIRMS WHATEVER THE BANK MAY DO PURSUANT TO THE TERMS OF THIS AGREEMENT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE BANK GRANTING ANY FINANCIAL ACCOMMODATION TO THE BORROWER.

13.5. <u>FORUM SELECTION AND CONSENT TO JURISDICTION</u>. ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE COURTS OF THE STATE OF ILLINOIS OR

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS; PROVIDED THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE THE BANK FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION. THE BORROWER HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF ILLINOIS AND OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE. THE BORROWER FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF ILLINOIS. THE BORROWER HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

13.6. <u>WAIVER OF JURY TRIAL</u>. THE BANK AND THE BORROWER, AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, EACH KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE IRREVOCABLY, ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT, ANY NOTE, ANY OTHER LOAN DOCUMENT, ANY OF THE OTHER OBLIGATIONS, THE COLLATERAL, OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY LENDING RELATIONSHIP EXISTING IN CONNECTION WITH ANY OF THE FOREGOING, OR ANY COURSE OF CONDUCT OR COURSE OF DEALING IN WHICH THE BANK AND THE BORROWER ARE ADVERSE PARTIES, AND EACH AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE BANK GRANTING ANY FINANCIAL ACCOMMODATION TO THE BORROWER.

13.7. <u>Assignability</u>. The Bank may at any time assign the Bank's rights in this Agreement, the other Loan Documents, the Obligations, or any part thereof and transfer the Bank's rights in any or all of the Collateral, and the Bank thereafter shall be relieved from all liability with respect to such Collateral. In addition, the Bank may at any time sell one or more participations in the Loans. The Borrower may not sell or assign this Agreement, or any other agreement with the Bank or any portion thereof, either voluntarily or by operation of law, without the prior written consent of the Bank. This Agreement shall be binding upon the Bank and the Borrower and their respective legal representatives and successors. All references herein to the Borrower shall be deemed to include any successors, whether immediate or remote. In the case of a joint venture or partnership, the tern "Borrower" shall be deemed to include all joint venturers or partners thereof, who shall be jointly and severally liable hereunder.

13.8. <u>Confirmations</u>. The Borrower and the Bank agree from time to time, upon written request received by it from the other, to confirm to the other in writing the aggregate unpaid principal amount of the Loans then outstanding under such Note.

13.9. <u>Confidentiality</u>. The Bank agrees to use commercially reasonable efforts (equivalent to the efforts the Bank applies to maintain the confidentiality of its own confidential information) to maintain as confidential all information provided to it by the Borrower, including all information designated as confidential, except that the Bank may disclose such information (a) to Persons employed or engaged by the Bank in evaluating, approving, structuring or administering the Loans; (b) to any assignee or participant or potential assignee or participant that has agreed to comply with the covenant contained in this <u>Section 13.9</u> (and any such assignee or participant or potential assignee or participant may disclose such information to Persons employed or engaged by them as described in clause (a) above); (c) as required or requested by any federal or state regulatory authority or examiner, or any insurance industry association, or as reasonably believed by the Bank to be compelled by any court decree, subpoena or legal or administrative order or process; (d) as, on the advice of the Bank's counsel, is required by law; (e) in connection with the exercise of any right or remedy under the Loan Documents or in connection with any litigation to which the Bank is a party; (f) to any nationally recognized rating agency that requires access to information about the Bank's investment portfolio in connection with ratings issued with respect to the Bank; (g) to any Affiliate of the Bank who may provide Bank Products to the Borrower or any Subsidiary, or (h) that ceases to be confidential through no fault of the Bank.

13.10. <u>Binding Effect</u>. This Agreement shall become effective upon execution by the Borrower and the Bank. If this Agreement is not dated or contains any blanks when executed by the Borrower, the Bank is hereby authorized, without notice to the Borrower, to date this Agreement as of the date when it was executed by the Borrower, and to complete any such blanks according to the terms upon which this Agreement is executed.

13.11. <u>Governing Law</u>. This Agreement, the Loan Documents and any Note shall be delivered and accepted in and shall be deemed to be contracts made under and governed by the internal laws of the State of Illinois (but giving effect to federal laws applicable to national banks) applicable to contracts made and to be performed entirely within such state, without regard to conflict of laws principles.

13.12. <u>Enforceability</u>. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by, unenforceable or invalid under any jurisdiction, such provision shall as to such jurisdiction, be severable and be ineffective to the extent of such prohibition or invalidity, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

13.13. <u>Survival of Borrower Representations</u>. All covenants, agreements, representations and warranties made by the Borrower herein shall, notwithstanding any investigation by the Bank, be deemed material and relied upon by the Bank and shall survive the making and execution of this Agreement and the Loan Documents and the issuance of any Note, and shall be deemed to be continuing representations and warranties until such time as the Borrower has fulfilled all of its Obligations to the Bank, and the Bank has been indefeasibly paid in full in cash. The Bank, in extending financial accommodations to the Borrower, is expressly acting and relying on the aforesaid representations and warranties.

13.14. <u>Extensions of Bank's Commitment</u>. This Agreement shall secure and govern the terms of (i) any extensions or renewals of the Bank's commitment hereunder, and (ii) any replacement note executed by the Borrower and accepted by the Bank in its sole and absolute discretion in substitution for any Note.

13.15. <u>Time of Essence</u>. Time is of the essence in making payments of all amounts due the Bank under this Agreement and in the performance and observance by the Borrower of each covenant, agreement, provision and term of this Agreement.

13.16. <u>Counterparts; Facsimile Signatures</u>. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Agreement. Receipt of an executed signature page to this Agreement by facsimile or other electronic transmission shall constitute effective delivery thereof. Electronic records of executed Loan Documents maintained by the Bank shall deemed to be originals thereof.

13.17. <u>Notices</u>. Except as otherwise provided herein, the Borrower waives all notices and demands in connection with the enforcement of the Bank's rights hereunder. All notices, requests, demands and other communications provided for hereunder shall be in writing and addressed as follows:

| | |
|---|---|
| To the Borrower: | Santa's Best<br>3750 Deerfield Road, Suite 1000<br>Riverwoods, Illinois 60015<br>Attn.: Edward H. Ruff, CEO |
| With a copy to: | Taft Stettinius & Hollister LLP<br>111 E. Wacker Drive, Suite 2800<br>Chicago, Illinois 60601<br>Attention: Michael A. Cramarosso, Esq. |
| To the Bank: | MB Financial Bank, N.A.<br>6111 N. River Road<br>Rosemont, Illinois 60018<br>Attn.: Alan L. Clark, Group Sr. Vice President |
| With copy to: | Thompson Coburn LLP<br>55 E. Monroe Street, 37th Floor<br>Chicago, Illinois 60603<br>Attn.: Victor A. Des Laurier, Esq. |

or, as to each party, at such other address as shall be designated by such party in a written notice to each other party complying as to delivery with the terms of this subsection. All notices addressed as above shall be deemed to have been properly given (i) if served in person, upon acceptance or refusal of delivery; (ii) if mailed by certified or registered mail, return receipt requested, postage prepaid, on the third (3rd) day following the day such notice is deposited in

any post office station or letter box; or (iii) if sent by recognized overnight courier, on the first (1st) day following the day such notice is delivered to such carrier. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

13.18. <u>Release of Claims Against Bank</u>. In consideration of the Bank making the Loans, the Borrower and all other Obligors do each hereby release and discharge the Bank of and from any and all claims, harm, injury, and damage of any and every kind, known or unknown, legal or equitable, which any Obligor may have against the Bank from the date of their respective first contact with the Bank until the date of this Loan Agreement, including any claim arising from any reports (environmental reports, surveys, appraisals, etc.) prepared by any parties hired or recommended by the Bank. The Borrower and all other Obligors confirm to Bank that they have reviewed the effect of this release with competent legal counsel of their choice, or have been afforded the opportunity to do so, prior to execution of this Agreement and the Loan Documents and do each acknowledge and agree that the Bank is relying upon this release in extending the Loans to the Borrower.

13.19. <u>Costs, Fees and Expenses</u>. The Borrower shall pay or reimburse the Bank for all reasonable costs, fees and expenses incurred by the Bank or for which the Bank becomes obligated in connection with the collection of the Obligations or enforcement of this Agreement, the other Loan Documents and all other documents provided for herein or delivered or to be delivered hereunder or in connection herewith (including any amendment, supplement or waiver to any Loan Document), or during any workout, restructuring or negotiations in respect thereof, including reasonable consultants' fees and attorneys' fees and time charges of counsel to the Bank, which shall also include attorneys' fees and time charges of attorneys who may be employees of the Bank or any Affiliate of the Bank, plus costs and expenses of such attorneys or of the Bank; search fees, costs and expenses; and all taxes payable in connection with this Agreement or the other Loan Documents, whether or not the transaction contemplated hereby shall be consummated. Notwithstanding the foregoing, the Bank waives any right of reimbursement from Borrower with respect to all such costs, fees and expenses incurred by the Bank or for which the Bank becomes obligated in connection with the negotiation, preparation and consummation of this Agreement and the other Loan Documents, but not any amendments, supplements or waivers to any Loan Documents after the date hereof. That portion of the Obligations consisting of costs, expenses or advances to be reimbursed by the Borrower to the Bank pursuant to this Agreement or the other Loan Documents which are not paid on or prior to the date hereof shall be payable by the Borrower to the Bank on demand. If at any time or times hereafter the Bank: (a) employs counsel for advice or other representation (i) with respect to this Agreement or the other Loan Documents, (ii) to represent the Bank in any litigation, contest, dispute, suit or proceeding or to commence, defend, or intervene or to take any other action in or with respect to any litigation, contest, dispute, suit, or proceeding (whether instituted by the Bank, the Borrower, or any other Person) in any way or respect relating to this Agreement, the other Loan Documents or the Borrower's business or affairs, or (iii) to enforce any rights of the Bank against the Borrower or any other Person that may be obligated to the Bank by virtue of this Agreement or the other Loan Documents; (b) takes any action to protect, collect, sell, liquidate, or otherwise dispose of any of the Collateral; and/or (c) attempts to or enforces any of the Bank's rights or remedies under the Agreement or the other Loan Documents, the costs and

expenses incurred by the Bank in any manner or way with respect to the foregoing, shall be part of the Obligations, payable by the Borrower to the Bank on demand.

13.20. <u>Indemnification</u>. The Borrower agrees to defend (with counsel satisfactory to the Bank), protect, indemnify, exonerate and hold harmless each Indemnified Party from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and distributions of any kind or nature (including the disbursements and the reasonable fees of counsel for each Indemnified Party thereto, which shall also include, without limitation, reasonable attorneys' fees and time charges of attorneys who may be employees of any Indemnified Party), which may be imposed on, incurred by, or asserted against, any Indemnified Party (whether direct, indirect or consequential and whether based on any federal, state or local laws or regulations, including securities laws, Environmental Laws, commercial laws and regulations, under common law or in equity, or based on contract or otherwise) in any manner relating to or arising out of this Agreement or any of the Loan Documents, or any act, event or transaction related or attendant thereto, the preparation, execution and delivery of this Agreement and the Loan Documents, including the making or issuance and management of the Loans, the use or intended use of the proceeds of the Loans, the enforcement of the Bank's rights and remedies under this Agreement, the Loan Documents, any Note, any other instruments and documents delivered hereunder, or under any other agreement between the Borrower and the Bank; provided, however, that the Borrower shall not have any obligations hereunder to any Indemnified Party with respect to matters determined by a court of competent jurisdiction by final and nonappealable judgment to have been caused by or resulting from the willful misconduct or gross negligence of such Indemnified Party. To the extent that the undertaking to indemnify set forth in the preceding sentence may be unenforceable because it violates any law or public policy, the Borrower shall satisfy such undertaking to the maximum extent permitted by applicable law. Any liability, obligation, loss, damage, penalty, cost or expense covered by this indemnity shall be paid to each Indemnified Party on demand, and failing prompt payment, together with interest thereon at the Default Rate from the date incurred by each Indemnified Party until paid by the Borrower, shall be added to the Obligations of the Borrower and be secured by the Collateral. The provisions of this Section shall survive the satisfaction and payment of the other Obligations and the termination of this Agreement.

13.21. <u>Revival and Reinstatement of Obligations</u>. If the incurrence or payment of the Obligations by any Obligor or the transfer to the Bank of any property should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (collectively, a "Voidable Transfer"), and if the Bank is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that the Bank is required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys' fees of the Bank, the Obligations shall automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

13.22. <u>Customer Identification – USA Patriot Act Notice</u>. The Bank hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "Act"), and the Bank's policies and practices, the Bank is

required to obtain, verify and record certain information and documentation that identifies the Borrower, which information includes the name and address of the Borrower and such other information that will allow the Bank to identify the Borrower in accordance with the Act.

13.23. <u>Eligible Contract Participation Savings Clause</u>.    Notwithstanding anything contained in this Agreement or the other Loan Documents to the contrary, the obligations of any Obligor hereunder shall not include any obligation to pay or perform the obligations of another Person under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act if and only to the extent that the guarantee of such Obligor of, or the grant by such Obligor of a security interest to secure, such obligation is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation thereof) by virtue of such Obligor's failure for any reason to constitute an "eligible contract participant" as defined in   the Commodity Exchange Act and the regulations thereunder at the time the guarantee of such Obligor or the grant of such security interest becomes effective with respect to such obligation.

[signature page follows]

54

IN WITNESS WHEREOF, the Borrower and the Bank have executed this Loan and Security Agreement as of the date first above written.

**MB FINANCIAL BANK, N.A.,**
successor in interest to Cole Taylor Bank


By: _Anthony J. Gattuso_
Name: _Anthony J. Gattuso_
Title: _Vice President_

**SANTA'S BEST,**
an Illinois general partnership

**BY: TINSEL/RUFF GROUP LIMITED PARTNERSHIP,** an Illinois limited liability partnership
Its: General Partner

By: **EDWARD H. RUFF AND ASSOCIATES, INC.,** an Illinois corporation
Its: General Partner

By: _Edward H. Ruff_
Name: Edward H. Ruff
Its: President

**BY: A-CHICAGO TECH, L.L.C.,**
a Delaware limited liability company
Its: General Partner

By: _Edward H. Ruff_
Name: Edward H. Ruff
Its: Manager

*[signature page – Amended and Restated Loan and Security Agreement]*

**Schedule 7.23**
Places of Business

1.  Room 412-413, 4F
    Tower 1
    Harbour Centre
    1 Hok Cheung Street
    Hunghom, Kowloon, Hong Kong

2.  1133 S. 16th Street
    Manitowoc, Wisconsin 54221

<u>Exhibit B</u>
The Edward Fraudulent Transfers

| <u>Date of Transfer</u> | <u>Amount</u> |
|---|---|
| 4/16/2018 | $ 750,000.00 |
| 4/20/2018 | $ 17,000.00 |
| 5/1/2018 | $ 1,666.67 |
| 5/1/2018 | $ 6,375.00 |
| 5/7/2018 | $ 50,000.00 |
| 5/8/2018 | $ 45,000.00 |
| 5/30/2018 | $ 15,000.00 |
| 6/1/2018 | $ 6,587.50 |
| 6/1/2018 | $ 1,666.67 |
| 6/13/2018 | $ 25,000.00 |
| 6/18/2018 | $ 150,000.00 |
| 6/27/2018 | $ 10,000.00 |
| 7/2/2018 | $ 1,666.67 |
| 7/5/2018 | $ 6,375.00 |
| 7/13/2018 | $ 15,000.00 |
| 7/30/2018 | $ 25,000.00 |
| 8/1/2018 | $ 1,666.67 |
| 9/4/2018 | $ 1,666.67 |
| 9/13/2018 | $ 18,000.00 |
| 9/17/2018 | $150,000.00 |
| 9/28/2018 | $ 7,500.00 |
| 10/1/2018 | $ 1,666.67 |
| 10/12/2018 | $ 17,000.00 |
| 10/24/2018 | $ 15,000.00 |
| 10/29/2018 | $ 6,000.00 |
| 11/1/2018 | $ 1,666.67 |
| 11/5/2018 | $ 10,000.00 |
| 11/19/2018 | $ 5,000.00 |
| 11/23/2018 | $ 48,000.00 |
| 11/28/2018 | $ 13,000.00 |
| 11/30/2018 | $ 10,000.00 |
| 12/3/2018 | $ 1,666.67 |
| 12/11/2018 | $ 20,000.00 |
| 12/28/2018 | $ 12,000.00 |
| 1/2/2019 | $ 1,666.67 |
| 1/3/2019 | $ 2,000.00 |
| 1/15/2019 | $ 170,000.00 |
| 1/29/2019 | $ 15,000.00 |

| | |
|---|---|
| 2/1/2019 | $ 3,666.67 |
| 2/6/2019 | $ 15,000.00 |
| 2/13/2019 | $ 25,000.00 |
| 2/25/2019 | $ 30,000.00 |
| 3/1/2019 | $ 3,666.67 |
| 3/8/2019 | $ 10,000.00 |
| 3/13/2019 | $ 10,000.00 |
| 3/26/2019 | $ 15,000.00 |
| 4/1/2019 | $ 3,666.67 |
| 4/3/2019 | $ 35,000.00 |
| 4/11/2019 | $ 45,000.00 |
| 4/16/2019 | $ 150,000.00 |
| 4/19/2019 | $ 15,000.00 |
| 4/19/2019 | $2,040,000.00 |
| 4/22/2019 | $ 250,000.00 |
| 5/1/2019 | $ 3,666.67 |

<u>Exhibit C</u>
The Caryn Fraudulent Transfers

<u>Date of Transfer</u>                <u>Amount</u>

| Date of Transfer | Amount |
|---|---|
| 5/1/2018 | $ 3,060.36 |
| 5/2/2018 | $ 30,000.00 |
| 5/2/2018 | $ 12,497.52 |
| 5/30/2018 | $ 10,203.06 |
| 6/1/2018 | $ 33,020.54 |
| 7/2/2018 | $ 2,842.87 |
| 7/6/2018 | $ 21,920.32 |
| 8/6/2018 | $ 27,904.29 |
| 8/6/2018 | $ 75,000.00 |
| 8/27/2018 | $ 40,000.00 |
| 8/28/2018 | $ 23,498.80 |
| 9/4/2018 | $ 2,879.29 |
| 10/1/2018 | $ 2,692.86 |
| 10/5/2018 | $ 10,000.00 |
| 10/9/2018 | $ 3,091.39 |
| 10/29/2018 | $ 3,242.96 |
| 11/1/2018 | $ 2,810.84 |
| 11/6/2018 | $ 370.07 |
| 11/7/2018 | $ 10,000.00 |
| 11/30/2018 | $ 17,327.27 |
| 12/3/2018 | $ 2,715.66 |
| 12/6/2018 | $ 20,000.00 |
| 12/26/2018 | $ 8,509.17 |
| 1/2/2019 | $ 2,696.06 |
| 1/3/2019 | $ 15,000.00 |
| 1/11/2019 | $ 35,000.00 |
| 1/25/2019 | $ 14,967.18 |
| 2/1/2019 | $ 6,701.59 |
| 2/28/2019 | $ 45,000.00 |
| 3/1/2019 | $ 11,460.66 |
| 3/19/2019 | $ 10,000.00 |
| 3/21/2019 | $ 20,000.00 |
| 4/1/2019 | $ 2,908.00 |
| 4/4/2019 | $ 10,000.00 |
| 4/19/2019 | $ 178,630.12 |
| 5/1/2019 | $ 1,000.00 |
| 5/3/2019 | $ 13,824.12 |